Per Curiam :
This contract case was referred to trial commissioner C. Murray Bernhardt, pursuant to Rule 45(a), for findings of fact and a recommendation for a conclusion of law. The commissioner has filed his report containing an opinion, proposed findings of fact, and a recommended conclusion of law. He would hold that the plaintiff is entitled to recover, with recovery to be determined under Rule 38(c). The plaintiff accepts the commissioner’s opinion and proposed legal conclusion, and offers only minor objection to certain of the findings. The defendant excepts to the commissioner’s opinion, his recommended conclusion of law, and many of the proposed findings. Briefs have been filed and there has been oral argument.
The court agrees with the opinion, findings, and recommended conclusion of the trial commissioner and adopts them (with minor modifications in the findings), together with this opinion, as the basis for its judgment in this case. Since the case was tried and the commissioner’s report filed before the grant of certiorari and the ruling in United States v. Carlo Bianchi and Co., Inc., 373 U.S. 709, the commissioner’s opinion does not take account of that recent decision. It is appropriate therefore to explain why, after Bianohi, we adopt the commissioner’s opinion and findings even though they refer to and rest upon significant evidence which was not before the Armed Services Board of Contract Appeals but was first introduced at the trial in this court.[1]
The ultimate issue in the case, relating to the meaning of the contract specifications, is one of law not of fact (see, e.g., W. H. Edwards Engineering Corp. v. United States, 161 Ct. Cl. 322 (1963); Guyler v. United States, 161 Ct. Cl. 159, 314 F. 2d 506 (1963)); that being so, it may very well be that this court is not precluded by the Bianchi decision or the Wunderlich Act (41 U.S.C. §§ 321-322) from considering any evidence bearing on that legal issue, no matter what the *806 Board of Contract Appeals determined or what was in the record before it. But we need not face that issue in the present case since there is another ground on which we can properly consider the new evidence without in any way flouting the Supreme Court’s ruling. That ground is the failure of the defendant to object to the admission or consideration of the new evidence at the trial in this court. Contrary to its action in the BiancM case, the Government did not here oppose or object to such evidence becoming a full part of the case, at any time until after the oral argument before this court. There was no hint of an objection at the trial; in fact, the Government introduced a quantity of new evidence to bolster the record before the Board. No objection to new evidence was stated in the briefs. Nor was one made at the argument. However, shortly thereafter the Government informed us that it did object. In these circumstances, we consider that no objection was timely made and that any exception available to the Government was voluntarily foregone and relinquished — unless the requirement stated in the BiancM decision is a jurisdictional one which cannot be waived while the case is pending in this court.
We do not regard the BiancM requirement as jurisdictional in that sense. The Wunderlich Act, itself, is not phrased in jurisdictional terms, and its legislative history does not suggest that Congress considered its provision for limited review so compelling that the Government could not waive it, wholly or partially.[2] In BiancM, the Supreme Court took pains to point out twice that the Government had affirmatively objected to the admission or consideration of new evidence in that case. There is nothing in the opinion to suggest that these objections were unnecessary or that the Court’s holding is a jurisdictional one. The opinions in the earlier cases in which the Supreme Court upheld finality clauses in Government contracts were likewise free from any suggestion that such clauses deprived this court of power; those decisions applied rules of contract law, not of judicial *807 jurisdiction.[3] That the problem is evidential or procedural, not jurisdictional, is also indicated by the two cases cited by the Supreme Court in Bia/ncM as showing that a court of original jurisdiction can perform the function of reviewing an administrative decision on the record made before the agency — Tagg Bros. & Moorhead v. United States, 280 U.S. 420 (1930), and National Broadeasting Co. v. United States, 319 U.S. 190 (1943). The opinion in the former characterizes as “a question of practice” the issue of whether de novo evidence should be introduced in the course of judicial review (see 280 U.S. at 442); the opinion in the latter calls this issue “a procedural point” (319 U.S. at 227). In both cases the Government had made timely objection against admission of new evidence (see 29 F. 2d 750, 757; 319 U.S. at 227); in deciding that de novo evidence should not be considered by the reviewing court, the Supreme Court was thus passing upon a point which had been duly raised during the proceedings in the reviewing court.
On principle, there is no more reason to consider the limitations of the Wunderlich Act to be non-waivable than in the case of other rules of procedure, practice, evidence — or even rules of substantive law — which are normally inapplicable if not properly invoked by the party benefitting from them. The important defense of failure to exhaust an administrative remedy, for example, must be raised if reliance is to be placed on it. There are many similar rules in this and other courts.[4] The rule precluding de novo evidence under the Wunderlich Act seems to us to stand on the same footing. It is not of such importance or character that it must be held to limit the court’s basic power as a court. The statute of limitations is not analogous. For this court the *808 bar of limitations is jurisdictional because Congress has thus limited its consent to sue the United States (Soriano v. United States, 352 U.S. 270, 273-74 (1957)). But the Wun-derlich Act is not a condition imposed upon suit against the sovereign; it is legislation governing suits by as well as against the United States and therefore more akin to a non-jurisdictional rule of procedural or substantive law which can usually be adduced or abandoned as the litigant sees fit.
There is one further problem in the general area of the Bianchi case. Having found that defendant breached the contract by refusing additional compensation for misinterpreting the original specifications and then changing them, we are returning the case to the trial commissioner under our Rule 38(c) for the determination of the amount of recovery. This is the appropriate procedure, instead of suspending to allow plaintiff to return to prove his case for compensation and damages before the contracting officer and/or the Board of Contract Appeals. Regardless of whether this case be viewed as arising under the Changes article of the contract or purely as an action for breach of contract outside the Changes article, trial before our commissioner is now the proper method of determining the amount of recovery. Since neither the contracting officer nor the Board of Contract Appeals reached the issue of compensation or recovery, a remand under Rule 38(c) does not contravene the requirement of the Wunderlich Act or the holding in Bianchi that departmental findings must be reviewed on the basis of the record before the agency. There were no departmental findings on the amount of compensation or recovery; very little testimony was taken on that issue before the Board and it was agreed that if the contractor prevailed on its appeal to the Board the matter of compensation would be remanded to the contracting officer for further development. To return the case at its present stage to the Army for a hearing and findings on that subject would only add to the delay which the Supreme Court sought to diminish through its ruling— without countervailing advantages. Unlike the Courts of Appeals when reviewing administrative decisions, this court and the district courts are well equipped to take and consider evidence on damage questions not decided by the adminis *809 trative agencies because they ruled against the contractor on the merits of his claim. In addition, the Wunderlich Act— unlike the normal statute vesting power in an administrative agency — does not grant the administrative bodies exclusive jurisdiction over the entire subject of the contract; the Act merely makes the administrative findings conclusive (in the absence of arbitrary action, etc.) on those particular matters of fact dealt with by the administrators, without depriving this court of its general jurisdiction over the contract under the Tucker Act. Accordingly, it will not trench upon the terms or policy of the Wunderlich Act, but will save the time and convenience of all parties, to try damage issues in this court where, as here, the agency has not reached or passed upon that phase.[5]
The plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).
OPINION OP COMMISSIONER
The plaintiff sues for breach of two contracts with the Army let in June 1955 through the Philadelphia Quartermaster Depot for the production of pneumatic mattresses. The breach alleged consists of the issuance of post-award change orders which are accused of altering certain test requirements incorporated by reference into the contract specifications so as to impose upon the plaintiff a greater requirement for the adhesive strength of 14" molded seams than the plaintiff thought the specifications initially demanded, thus resulting in losses due to delays and extra material costs denied to the plaintiff in its appeal under the *810 Disputes clause to the Armed Services Board of Contract Appeals. The defendant not only relies on the finality of the ASBCA decision under the Disputes clause of the contracts, but also says that the change orders did not change but merely clarified certain aspects of test methods which were not applicable to the contracts in the first place, and that, furthermore, the plaintiff’s action in stopping production voluntarily without just cause is an intervening cause which precludes it from recovery of damages due to delay of its own making. The issue of damages has been severed for future attention depending on the decision as to liability to which this opinion and report are confined.
The mattresses were made of rubber-covered nylon fabric fashioned into a shape suitable for inflation according to military specifications incorporated into the contracts. The minimum adhesive strength of its various seams were set forth in Table I of the specifications which read pertinently as follows:

The molded seams referred to in items 23 and 24 of the above table form C-beams which serve to hold the mattress in shape, and the %" molded seams referred to in items 21 *811 and 22 run along the edges of the mattress and retain air when the mattress is inflated.
Federal Specification CCC-T-191 entitled “Textile Test Methods” was incorporated by reference into the basic specifications governing the contracts in suit, and paragraph 4.8 of the basic specifications entitled “Tests” provided that the methods of testing in Federal Specification CCC-T-191, “wherever applicable, shall be followed”. Paragraph 4.3.3.2.2 of the basic specifications further provided that the adhesive strength of the molded seams “shall be tested as specified in Method 5962 of Specification CCC-T-191.” Test Method 5962, entitled “Adhesion of Strapped Seams”, which is contained in Specification CCC-T-191, provides that the testing procedure and reporting thereof “shall be that described in method 5960”, which is also contained in Specification CCC-T-191. In turn, Method 5960, after describing the selection of the test specimen, testing apparatus, and the testing procedure, provides under paragraph 5 entitled “Report” a subparagraph 5.1 entitled “Adhesion of Specimen”, reading as follows:
The adhesion of the specimen shall be the average of the five highest peak loads of resistance registered for 3 inches of separation of the seam divided by the width of the seam in inches. If the number of peak loads is less than five, the average of the loads for the lesser number of peaks divided by the width of the seam in inches shall be the adhesion of the specimen. [Emphasis supplied.]
The plaintiff concluded that the foregoing provisions of the basic specifications and referenced documents collectively required a molded seam testing at % pound, or at the rate of 3 pounds per inch, while the defendant maintains they require 3 pounds for the y<¿' seam because the words “divided by the width of the seam in inches”, quoted from Method 5960 in the preceding paragraph, are not applicable. This 400 percent difference between the respective interpretations is the root of the dispute.
The parties first became aware of their disagreement during the preproduction phases of the contract. The plaintiff tested out its first experimental y¿' seams at iy2 pounds, or at the rate of 6 pounds per inch, which it considered to *812 be twice its concept of the specification requirement of 3 pounds. On August 3,1955, the contracting officer approved the seam as conforming to specifications on the basis of a courtesy test made by the Philadelphia Quartermaster Depot which showed that the %" seams had satisfactorily tested out at 3 pounds,[6] which was stated to be the specification requirement. The plaintiff was puzzled and dissatisfied with this report of marginal compliance, since it varied radically from its own test results, so ran further seam adhesion tests, as did its material supplier, Haartz-Mason. These resulted in the same showing as before. In the meantime, the contracting officer had received a complete preproduction mattress from plaintiff and reported on August 15 that it passed visual examination.
By mid-August plaintiff was fully prepared for production but, because of the disturbing results reported by the defendant on the seam adhesion tests, it suspended operations, including the rubber coating of base fabric by its supplier. Under the circumstances this suspension was justified and prudent, for to have proceeded into production when the seams were reported by the Government to only barely meet adhesion requirements, while they were substantially less than the Government’s version of those requirements in testing by plaintiff, would have invited a risk of substantial production rejections. A distinct correlation existed between the thickness of the rubber coating on the fabric and the strength of the molded seam, so if the plaintiff were going to have to produce molded seams complying with the Government’s interpretation of the adhesion requirements, it would have to order more costly material with a heavier rubber coating in order to have a reasonable margin of safety.
On August 17, 1955, the plaintiff wrote to the contracting officer explaining its interpretation of the specifications governing the seam adhesion requirement and advising that production had been suspended pending confirmation of its views. The following day the plaintiff sent to the contracting officer another preproduction sample mattress with a *813 request that it be fully tested, including destructive tests, for tbe fact tbat tbe mattress it bad sent earlier bad passed tbe defendant’s visual examination was not sufficient assurance for tbe plaintiff to undertake full scale production. On September 2, 1955, tbe contracting officer informed plaintiff that tbe latter’s interpretation of tbe adhesion requirement for tbe 14/' seam was wrong, tbat in effect tbe parts of Test Method 5962 upon which plaintiff relied did not apply, and tbat the requirement for the 14" seam was 3 pounds per 14".
At a conference on September 15,1955, attended by representatives of all parties affected, including plaintiff’s supplier, the dispute was discussed at length and the contracting officer adhered to bis previously announced position. Accordingly, the plaintiff then instructed Haartz-Mason to furnish a material with a heavier rubber coating so as to meet tbe defendant’s requirement for tbe seam. Actually, Haartz-Mason bad been experimenting since mid-August with such a material.
In the meantime, and unknown to plaintiff until discovered just prior to tbe trial in this court, tbe contracting officer’s legal and technical advisers discussed among themselves tbe problem and its correction. The Government consultant who bad written tbe specifications acknowledged to bis superiors tbat there were errors and conflicts in tbe specifications, and be was not aware until that time tbat tbe language of Test Method 5962 contained tbe key words “divided by tbe width of tbe seam in inches”, which lent some credence to tbe plaintiff’s view tbat tbe adhesion requirements of tbe specifications were impliedly couched in terms of pounds per inch. The two memoranda of September 16, 1955, which reflect these discussions among tbe contracting officer’s personnel, are in evidence here but were not in tbe record before tbe ASBCA. They are in stark conflict with tbe official position taken by tbe contracting officer and by bis principal assistant before tbe ASBCA tbat the specifications were clear and unambiguous. They conclude with this statement:
It was agreed there is no clear explanation tbat could be given tbe contractor concerning this lack of clarification and Mr. Moldawer [an Army attorney] stated that it now appeared to be a legal problem insofar as determining what action to take in this matter.
*814 The contracting officer’s solution was to issue change orders on September 23, 1955, which deleted from Test Method 5962 the offending and confusing language “divided by the width of the seam in inches,” for the announced purpose “to alleviate any areas of conflict caused by any misunderstanding of the specifications.” Plaintiff was notified on September 21 that its delay in starting production would not be considered excusable because the contracting officer had advised plaintiff on August 15 that its preproduction sample mattress had been approved. Plaintiff promptly instructed its supplier Haartz-Mason on September 22 to resume coating of the material, using a heavier rubber coating for reasons which have been explained.
Both contracts were fully performed by May 4, 1956. The change orders had provided for no increase in compensation nor for time extensions, so in October 1955 the plaintiff had requested both. The time extensions were granted and on July 14, 1956, the plaintiff filed its formal claim for increased costs in a reduced amount. This was denied by the contracting officer in his findings of fact and decision of August 27,1956, on the grounds that the adhesion requirements of the specifications were clear and unambiguous, that the language stricken from Test Method 5962 by the change orders was not applicable to the determination of adhesion requirements, and that its deletion was for purposes of clarification rather than elimination of an ambiguity.
This adverse decision was duly appealed, and on February 20, 1958, the ASBCA denied the appeal on the grounds that the adhesion requirement of 3 pounds for the seam, as provided in Table I of the specifications, was clear and unambiguous, and that the method of computing adhesion prescribed in Test Method 5962 was not applicable to the contract.
Clearly the plaintiff entered into the contract on the assumption that it required only one-fourth of the adhesive strength for the seams actually intended by the Government, and this, in turn, resulted in extra costs due to delays and a more expensive material using a heavier rubber coating. It must be determined whether it was misled into this error by ambiguity of the specifications which were *815 prepared by the defendant. As a prefatory matter, it should be stated that the the general practice in both industry and Government was to express adhesion weights of molded seams in pounds, which has an accepted meaning of pounds per inch of seam width unless it is otherwise expressly stated. This fact was advanced by plaintiff and was not challenged during the administrative hearing,[7] but it was not referred to in the ASBCA decision so apparently was given no weight. Without this understanding and without the key words in Test Method 5962, which were excised by the change orders, unquestionably the literal wording of Table I in the specifications would convey the requirement that molded seams must withstand a pull of at least 3 pounds, as the Government contends. But to a manufacturer familiar with the industrial practice of expressing adhesion values on a common basis of pounds per inch for purposes of convenient comparison, the data in Table I takes on a different light, particularly where he is directed in the incorporated Test Method 5962 to report adhesion weights in terms of pounds per inch. The presence in Test Method 5962 of the key words “divided by the width of the seam in inches” would logically confirm in the plaintiff’s mind the defendant’s awareness of and intention to follow the prevailing practice.
Moreover, the plaintiff believed that the adhesive strengths of the seams of various widths and of the rubber coating to the nylon fabric as they were prescribed in Table I of the specifications were intended to preserve an approximately standard relationship to each other throughout the mattress, for the internal air pressure of the mattress when inflated and in use should be exerted equally in all directións against the containing fabric and its seams. Without going into all of the detailed mathematics of the problem it would appear that plaintiff was correct in believing that its interpretation of the adhesion requirements expressed in Table I for the various parts of the mattress would provide a more standard relationship than if, as the defendant contends, the Table I requirement for 14" molded seams were to be read directly as 3 pounds per yy instead of 3 pounds per inch. Further comparison of the adhesion requirements in Table I gives *816 additional validity to the plaintiff’s view that its interpretation would result in a more consistent relationship of strengths throughout the mattress. For example, Table I coupled with a referenced test method provides in substance that the adhesion of the rubber coating to the fabric must be at least 4 pounds per inch, whereas defendant’s interpretation of the Table I requirement for the and %" molded seams would be at the rate of 12 and 8 pounds per inch, respectively. Since two pieces of rubber-coated fabric are pressed together on a die under heat to mold a seam, it would be theoretically inconsistent to require that the adhesive strength of the and %" seams be three and two times, respectively, greater than the bond between the rubber coating and its host fabric, even though the molding of the seams by heat and pressure serves to strengthen slightly the bond between the rubber coating and the fabric in those areas.
If we add to the foregoing reasoning the uncertainty which the author of the specifications himself expressed as to their lack of clarity, we are brought to the rule expressed in the case of Peter Kiewit & Sons’ Company, et al., v. United States, 109 Ct. Cl. 390 (1947), at page 418:
* * * Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted. Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it. This rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions.
This principle was cited with approval more recently in Western Contracting Corporation v. United States, 144 Ct. Cl. 318, 326, and in Anderson Construction Co. v. United States, 153 Ct. Cl. 475, 289 F. 2d 809 (1961). All of the elements requisite for application of the rule in Kiewit are present in the instant case.
*817 That the ASBCA erred in. its decision is clear from what has been said above. Whether it was sufficiently in error to warrant reversal may depend on the standards imposed by the Wunderlich Act (41 U.S.C. §§ 321, 322), which immunizes from judicial correction administrative decisions on questions of fact unless they are “fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or [are] not supported by substantial evidence.” But the Act also precludes finality to any administrative decision on matters of law. The distinction between law and fact, a vestigial transplant from the jury system where the law is the domain of the judge and the facts of the jury, has been a frequent battleground for courts [8] and commentators.[9] In truth it is a brave but habitually futile exercise to establish wash proof guidelines for these fraternal twins in whom there is a liberal admixture of genes. If it can be generalized this court customarily has found interpretation of contract provisions to be a question of law. See cases cited in Wunderlich, et al., v. United States, 117 Ct. Cl. 92, 212-214; Cramp Shipbuilding Co. v. United States, 122 Ct. Cl. 72, 97; Ready-Mix Concrete Co., Ltd., v. United States, 141 Ct. Cl. 168, 176; Associated Traders, Inc., v. United States, 144 Ct. Cl. 744, 750-751. In Kelley Co. v. Comm'r., 326 U.S. 521, the Supreme Court footnoted a pithy comment, at page 527, from Dickinson, Administrative Justice, c. III, p. 55:
* * * Matters of law grow downward into roots of fact, and matters of fact reach upward, without a break, into matters of law. The knife of policy alone effects an artificial cleavage at the point where the court chooses to draw the line between public interest and private right.
Demarcation is sometimes simplified in a case, such as here, where interpretation of a contract specification is in issue. If the query is as to whether a given product complies *818 with, specifications, then in all likelihood conflicting facts must be entertained and resolved. If it is as to whether specifications require a product to be made in a certain manner, then the solution just as probably lies within the four corners of the instrument and will yield to the logic of language analysis, a lawyer’s job. These distinctions are illustrated in Crystal Soap & Chemical Co., Inc., v. United States, 103 Ct. Cl. 166 (1945), and in Wagner Whirler and Derrick Corp. v. United States, 128 Ct. Cl. 382, 393-394 (1954). In the present case the plaintiff is insisting on one interpretation of the specifications for seam adhesion and defendant is insisting on another interpretation which would make the seams four times as strong. The question is which interpretation is correct, and there is no question or argument as to the product which would result from either interpretation. With but one exception the problem can be solved on the basis of undisputed facts. The sole exception is the fact that the general practice in both industry and Government was to express adhesion weights of molded seams in terms of pounds per inch. This fact is not determinative of the issue unaided, but merely influences a determination which is persuasive for other reasons. Moreover, it was not mentioned by either the contracting officer or the ASBCA in their respective adjudications, and so presents no barrier of finality to overcome. Accordingly, the controversy is one sounding in law and is thus outside the scope of the Disputes article in the contracts. As stated in Navy Contract Law, 2d Ed., § 9.30, at page 553:
* * * the Board may in its discretion pass upon all questions of law necessary for a complete adjudication of the issues of fact presented,[10] “Finality”, however, will attach only to the Board’s decision on questions of fact, not to its ruling on any question of law.[11]
The plaintiff is entitled to recover its damages flowing proximately from the breach of contract by the defendant, the amount of damages to be determined in accordance with Rule 38(c).
*819 The court, having considered the evidence, the report of trial commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follow:
1. Separation of issues. — By order of the commissioner pursuant to Rule 88 (c), the issue of liability was separated for trial and the following facts are confined to that issue.
2. The plaintiff. — Plaintiff is an Illinois corporation with its principal place of business in Chicago. It was organized in 1918 and has been continuously engaged in the manufacture of briefcases, portfolios, and some luggage. It has engaged in defense production since 1941 in addition to its civilian production. Prior to the award of the two contracts in suit, it had not made pneumatic mattresses but had made life preservers and anti-exposure suits from rubber-coated nylon fabrics requiring molded seams. Since then it has manufactured approximately three-quarters of a million of such mattresses for the Government and approximately 400,-000 of them for the civilian market.
3. The contracts and issue described. — On June 17, 1955, plaintiff and the Philadelphia Quartermaster Depot, Department of Defense, entered into two contracts for the manufacture and delivery of 193,488 pneumatic mattresses for a total consideration of $1,160,059.20. The contracts contained the standard Changes and Disputes clauses. The item called for by the contracts is an inflatable mattress or pad manufactured from rubber-coated nylon material in accordance with Military Specification MIL-P-10474A (QMC), dated October 29,1951, as amended by Amendment No. 2, dated September 23,1954, with immaterial exceptions. Outer molded seams %" in width, forming the external or “fin” edge, the rubber-coated material, and an inflation nozzle and stopper assembly constitute the components that permit the mattress to remain inflated. Inner length-wise molded seams in width are designed to hold the mattress in shape and give it a tubular construction when inflated. The 1,4" molded seams are associated in use with the so-called C-beam construction in the mattress. They are molded as opposed to being cemented. The dispute concerns the interpretation to be given the military specifications as to the *820 adhesion strength required for the molded C-beam seams.
4. Military ¡Specifications. — (a) Military Specification MIL-P-10747A (QMC), dated October 29, 1951, prior to its amendment by Amendment No. 2, on September 23, 1954, set forth the governing requirements as to approval of a preproduction sample, composition of the base fabric and rubber-coating compound, color, inspection, etc., and incorporated by reference the textile test methods defined in Federal Specification No. CCC-T-191 and supplements thereto. Table I in the specifications before their change by Amendment No. 2 provided in pertinent part as follows:

(b) Paragraph 2.1 of the Military Specification stated in part as follows:
2.1 The following specifications and standards, of the issue in effect on date of invitation for bids, form a part of this specification:
SPECIFICATIONS FEDERAL
*****
CCC-T-191 — Textiles, General Specifications, Test Methods and Supplement thereto.
*821 Amendment No. 2 to tbe Military Specification changed this specification to read as follows:
CCC-T-191 — Textile Test Methods.
(c) Paragraph 4.3 of the Military Specification stated:
4.3 Tests. — The methods of testing in Specification CCC-T-191, and supplement thereto, wherever applicable, shall be followed.
The words “and supplement thereto” in the foregoing were deleted by Amendment No. 2 to the specification.
(d) Paragraphs 4.3.3, 4.3.3.2 and 4.3.3.2.2 of the Military Specification are entitled, respectively, “Adhesion Test”, “Seams”, and “Molded Seams, C-beam construction”, the latter paragraph reading as follows in pertinent part:
Adhesion shall be tested as specified in section III, paragraph 6b (3) of supplement to Specification CCC-T-191.
In Amendment No. 2 to the specification the words “method 5962 of” were substituted for the words “section III, paragraph 6b (3) of supplement to”, and the latter were deleted from that paragraph of the Military Specification.
(e) The Test Method 5962 referred to above in the amendment to paragraph 4.3.3.2.2 of the Military Specification appears in Specification CCC-T-191b, is dated May 15,1951, and is entitled “Adhesion of Strapped Seams”. Test Method 5962 provides in part that the testing procedure and reporting thereof “shall be that described in method 5960”, with an irrelevant exception. Paragraph 5 of the Test Method 5960, under the subtitle “Report”, after describing the selection of the test specimen, the apparatus to be used for testing, and the procedure for testing the specimen in the machine, provides in subparagraph 5.1, entitled “Adhesion of specimen”, as follows:
The adhesion of the specimen shall be the average of the five highest peak loads of resistance registered for 3 inches of separation of the seam divided by the width of the seam in inches. If the number of peak loads is less than five, the average of the loads for the lesser number of peaks divided by the width of the seam in inches shall be the adhesion of the specimen. [Emphasis supplied to indicate the language causing the existing problem.]
(f) Although Table I quoted in paragraph (a) of this *822 finding provides the same adhesion requirements for molded seams after immersion in water as before, Test Method 5964 of CCC-T-191b, which relates to the method of testing wet seams, omits the equivalent of the wording in Test Method 5960, which has been italicized in paragraph (e) of this finding; Test Method 5964 does not provide that the adhesive strength of a wet seam be converted into terms of pounds per inch for reporting purposes. However, Test Method 5964 requires a report not in pounds but in percentage of change, and for this type of report it is immaterial whether or not there is a conversion to a pound per inch basis.
5. Adhesion Test Method. — The purpose and scope of Federal Specification CCC-T-191b is stated in its Section 1 to be as follows:
This specification gives the general physical, chemical, and biological methods for testing textile fibers; yarn, thread, rope, and other cordage; cloth; and fabricated textile products, for conformance with the requirements of materials specifications used by purchasing agencies of the United States Government. It does not include certain methods which are described in the specifications for the materials to which they apply. It does not include all of the test methods used in the industry. This specification was prepared in order to eliminate unnecessary or undesirable variations in the general testing procedures.
Federal Specification CCC-T-191b with its test methods is a work promulgated by the Government after consultation between industry and interested Government agencies, including the Armed Forces. Test Method 5960 is a standard Government test method. The term “adhesion” in the context of the test method means the strength by which two pieces of material adhere together. The amount of adhesion is determined by the weight or load necessary to separate the two pieces of fabric. It is the general practice in both industry and Government to express adhesion weights in pounds, which has an accepted meaning of pounds per inch of width unless it is otherwise expressly stated. Materials are tested for their adhesion strength in a machine which is described in detail in Test Method 5100 in CCC-T-191b. *823 In general, the pieces of the fabric to be tested are separated to a certain distance, one end of the fabric is placed in a stationary jaw of the testing machine and the other piece is placed in a movable jaw. As the two pieces of the material are pulled apart by the moving jaw a recording device on the machine records the amount of load necessary to separate them. If the material being tested is more or less than an inch in width the conversion of the reading into pounds per inch is a simple mathematical problem. For example, to convert a direct machine reading of three pounds for a seam into adhesive strength per inch, the three-pound reading is divided by the width to obtain an adhesion value of 12 pounds per inch.
6. Subcontract source of material. — Plaintiff does not manufacture its own textiles. It purchases the necessary components and fabricates the end items only. In this instance it purchased its basic uncoated nylon fabric from Putnam Mills of New York, and had the rubber coating of the fabric applied by Haartz-Mason of Watertown, Massachusetts. The latter enjoys a good reputation in the industry and has had substantial experience in Government contract work, specializing in rubber coating of fabrics. In its requests for quotations from its suppliers plaintiff always refers to the applicable military specifications.
7. Preaward, negotiations and preparation. — Plaintiff received an invitation to bid in mid-March 1955. At that time it was qualified from the standpoint of general experience and equipment to perform the contracts, although it lacked the actual dies to be used in the molding process. There was negotiation between the parties and several price quotations were submitted by plaintiff prior to its successful offer in June 1955. In anticipation of receiving an award plaintiff proceeded to develop techniques and procedures, obtaining a small roll of material and preparing samples from it. The invitation provided that sample mattresses would be available for inspection, but the sample available for plaintiff’s inspection had cemented seams rather than the molded C-beam type of seams.
8. Direction to submit components for testing. — On June 22, 1955, the contracting officer requested the plaintiff to *824 submit components to the Quartermaster Corps laboratory for testing as required by the contract in order to expedite production
9. Plaintiffs interpretation of adhesion requirement.— Plaintiff was adequately equipped for, and was experienced in, conducting seam adhesion tests in its factory, and also made use of outside laboratories on occasion. Both before and after the letting of the contracts in suit plaintiff tested seams molded from rubber-coated fabric furnished by its suppliers to comply with specifications. Plaintiff interpreted the specifications, including Test Methods 5962 and 5960 of Federal Specification CCC-T~191b, to require the application of the mathematical formula contained in the “Report” requirements of the Test Methods (quoted in finding 4(e), supra), and thus averaged the five highest peak loads registered on the testing machine and divided the result by the width of the seam being tested in inches. With respect to the 14" seam the test results obtained by plaintiff in applying the formula were reported in terms of pounds per inch. On this basis it was averaging about six pounds per inch, or about twice the plaintiff’s interpretation of the minimum requirement of three pounds contained in line 28 for the Lot Average Requirements in Table I of the Military Specifications (finding 4(a), supra). Translated to a 14" basis the results being obtained by plaintiff were averaging iy2 pounds per quarter inch, while the interpretation given by plaintiff to the contract in the light of Test Methods 5962 and 5960 would require only three-quarters of a pound for a quarter-inch seam.
10. Preproduction testing. — On July 14, 1955, plaintiff forwarded to the contracting officer a sample section of a preproduction mattress and requested that the seam be tested for compliance with seam adhesion requirements. By letter of August 3, 1955, the contracting officer advised the plaintiff that the seams had tested at 3 pounds, as compared with the minimum requirement of 3 pounds for lot average and 2.5 pounds for sample unit as set forth in Table I (finding 4(a), supra). On August 8, 1955, plaintiff submitted a complete preproduction mattress to the defendant for testing, and by letter dated August 15 (received by plain *825 tiff August 18) the contracting officer advised plaintiff that the mattress passed visual examination.
11. Plaintiff’s readiness mid-August 1955. — As of mid-August 1955 the plaintiff was fully prepared to perform the contracts in suit from the standpoint of adequate equipment and material. Its preproduction mattresses held air under inflation and it deemed them to be serviceable for intended uses. There is no proof that pneumatic mattresses so constructed would not be serviceable, although no standards of serviceability are stated. Without adequate service testing it cannot be stated whether or not a pneumatic mattress with seams constructed to pass the plaintiff’s interpretation of the adhesion requirements of the specifications would be suitable.
12. Discrepancy in test results. — Prior to being advised under date of August 3 that the seams tested and passed at 3 pounds (finding 10, supra), the plaintiff 'had been testing seams and consistently obtaining results approximately double or better than the minimum adhesion requirement for such seams, according to its interpretation of the specifications. It thus felt that it had a margin of safety to take care of production variations. The defendant’s report of August 3 (finding 10) showed an adhesion value about 100 percent lower than plaintiff had anticipated, causing the plaintiff to run more seam tests which produced results substantially the same as it 'had obtained before. Plaintiff’s supplier, Haartz-Mason, also ran laboratory tests and like plaintiff obtained results of approximately 1 y2 pounds per 1/4" or six pounds per inch.
13. August 17,1955 letter. — On August 17,1955, plaintiff wrote the contracting officer, referring to a telephone conversation two days before, and stating the following:
Specification requirements as listed in Table I of Specification MIL-P-10747A and Amendment 2, Item 23, require wide molded seam to have a minimum strength of 3 lbs. According to Amendment 2 which refers to textile test methods, per CCC-T-191b, the method of testing is described as method #5962. Paragraph 5 of test method #5962 refers_ to reporting all results the same as method #5960, which states: “* * * The average of the loads for the lesser number of peaks *826 divided by the width of the seam in inches shall be the adhesion of the specimen”.
The described method of reporting results would imply that test results of adhesion on wide molded seam would have to be a minimum of % lbs. Our supplier, the Haartz-Mason Company, is in accord with our interpretation since the requirement for adhesion of coating to basic fabric as listed in Table I, of Specification MIL-P-10747A, is 8 lbs. This would mean a 4 lbs. per lineal inch requirement, since CCC-T-191b specifies a 2" wide seam to be used during the test.
Tests have been conducted by Haartz-Mason with results regarding adhesion paralleling our own. They have informed us that their minimum requirement per specifications is 4 lbs. per inch and our requirement per specification is 3 lbs. per inch. This relationship appears to be correct in view of the fact that Haartz-Mason has stated it would be difficult to achieve stronger adhesion between plies of coated fabric than there is between basic fabric and the coating on it.
All production has been suspended at our coater’s plant and will not proceed until confirmation of our interpretation is received from your office.
We are prepared to go into immediate production and have already submitted preproduction samples. It is requested that expeditious action be taken to avoid any possible delays.
14. August 18,1955 letter. — On August 18, 1955, plaintiff wrote the following letter to the defendant:
The above referenced letter states pre production sample submitted has been given “visual check examination” and found to comply with applicable requirements.
It is assumed from this statement that all physical laboratory tests have not been performed and we feel it would be to our mutual advantage if complete test results were available before going into full scale production.
We are submitting under separate cover a second finished mattress which we would like to have tested for all requirements including destructive tests as may be necessary j>er production sampling procedure.
Request is made that courtesy test be perf onned.
The contracting officer did not comply with the request in the foregoing letter.
*827 15. September 2,1955 letter. — On September 2, 195'5, the contracting officer wrote to the plaintiff as follows:
Keference is made to your letter of 17 August 1955. You are advised that a direct reading is to be taken from Table I of Specification MIL-P-10747A. The requirements for the % inch seam is three pounds per % inch. If the referenced table read three pounds per inch, then test method #5962 of CCC-T-191b would apply. Test method #5962, therefore, merely indicates the method of testing.
The correlation between the adhesion of coating to basic fabric and adhesion of molded seam, as interpreted by you is invalid. A direct reading from Table I, Item 16, is to be taken for the adhesion of coating to basic fabric with test method #5970 of CCC-T-191b indicating the testing methods.
In view of the fact that your preproduction sample indicates that the % inch seam met the three pound minimum requirement, it would appear that your production methods are correct. It is believed, however, that the foregoing information will clarify the situation.
16. Adhesion of rubber ooatmg to fabric. — Test Method 5970, to which the contracting officer referred in the second paragraph of his letter of September 2, 1955 (finding 15, supra) was a method set forth in Federal Specification CCC-T-191b to determine the resistance to separation of the rubber coating from the fabric The requirements in Table I of the specifications (finding 4(a), supra) for adhesion of the coating to the fabric was six pounds for a sample unit and eight pounds for a lot average, but these requirements were for specimens two inches in width, so converted into terms of one inch in width the adhesion requirements would be three pounds and four pounds for sample unit and lot average, respectively. The testing was to be done on the same machine used for testing the seam adhesion, and the test result was to be the average of the five highest peak loads of resistance. Haartz-Mason tested the coated fabric for adhesion of the rubber coating to the C-beam fabric and, on July 28,1955, reported an adhesion strength of 16 pounds per two-inch strip, or double the minimum lot average requirements of the specifications. Haartz-Mason applied the rubber coating to the fabric by chemical means, and when the plaintiff molded the fabric in the manufacture of sleep *828 ing pads by application of beat and pressure it bad tbe effect of vulcanizing tbe rubber, thereby causing tbe rubber to penetrate tbe fabric somewhat and increasing tbe bond between tbe coating and tbe fabric. Tbe heat and pressure also vulcanized (i.e., molded) tbe seams, causing a bead of extruded rubber coating to form along the outer edge of the seams which increased their adhesion to some extent. In general and within inexact limits, thickening tbe rubber coating on tbe fabric tends to make possible a stronger molded seam, and molding tbe seams tends to increase tbe adhesion of the rubber coating to tbe fabric in those areas.
17. Justification for production halt. — On September 8, 1955, the plaintiff renewed its earlier request to tbe contracting officer that be approve tbe second sample pneumatic mattress which bad been submitted for approval on August 18, 1955, so that plaintiff could proceed with tbe contract. The test results reported by tbe defendant’s laboratory did not concur with those obtained by plaintiff and Haartz-Mason, and plaintiff did not want to get into production until it was sure that tbe material was acceptable to the defendant. Plaintiff wanted the defendant to test tbe mattress completely for all requirements including destructive tests, which it considered itself unable to perform. Under tbe circumstances which existed, it was reasonable for tbe plaintiff to refrain from getting into production of mattresses which thus far seemed to provide only marginal compliance with tbe requirements of tbe specifications as interpreted by tbe defendant.
18. Negotiation for different material. — On September 14, 1955, plaintiff met with Haartz-Mason to determine what would be required in tbe latter’s process of supplying tbe rubber-coated fabric in order to meet the defendant’s interpretation of tbe specification requirements as described in defendant’s letter of September 2, 1955 to plaintiff (finding 15, supra).
19. Conference of September 15,1955. — On September 15, 1955, a meeting was held at tbe Philadelphia Quartermaster Depot attended by representatives of the defendant, plaintiff, and Haartz-Mason. The purpose of tbe meeting was to discuss tbe conflict in the interpretation of the specification *829 requirements as to the 14" molded seam, and the defendant insisted on its interpretation.
20. Order for new. material. — After tbe meeting of September 15, plaintiff instructed Haartz-Mason to furnish a material with a heavier coating of rubber to help meet the defendant’s requirements as to the adhesion strength of the seams. Haartz-Mason had been experimenting with a heavier rubber coating since learning the preceding month of the problem about seam adhesion.
21. Telephone conference No. 1 of September 16. — On September 16, 1955, a conference by telephone was held between the contracting officer, his superior, Mr. Shurtleff,[12] and an Army legal adviser. The contracting officer’s memorandum for the record reporting the substance of the conference reads as follows:[13]
A conference telephone call between Lt. Colonel Trial, Attorney Moldawer, Captain Hersh and Mr. Shurtleff was held in reference to the contentions of Stein Bros, regarding test methods and evaluation results on their mold of the seams.
Mr. Moldawer explained to Shurtleff that there appears to be a conflict in the language of the specification Par. 5.1 of Method 5960, Federal Specification CCC-T-191b states that result of the five highest loads of resistance registered for 8" of separation of the seam is to be divided by the width of the seam in inches whereas Par. 4.1 of Method 5962 states that “except that the strapping shall be pulled away from the seam and the resistance of such separation registered by means of the autographic recording device.” It was explained to Shurtleff that Stein has determined that Method 5960 should be used. The results obtained by this method would not agree with table I of specification MXL-P-10747A (QMC).
Shurtleff then wanted to know what Stein wanted and it was explained to him that Stein insisted that he must continually shoot for a higher adhesion than the minimum requirement in order to meet the minimum.
Col. Trial stated that a decision had been given the contractor that a minimum of 3 lbs is required on the 14" seam and it is the contractor’s contention that by *830 application of method 5960 he would then only be required to produce a seam with adhesion qualities of % of a pound.
Mr. Shurtleff stated that he felt sure there was some reference in Federal Specification CCC-T-191b which stated that this was only a reference spec and that the applicable spec for the end item would govern. He stated he would check into this matter and call back.
With reference to the concluding paragraph of the foregoing memorandum, Mr. Shurtleff discovered on investigation that Federal Specification CCC-T-191b was not merely a reference specification as he had thought, but that Test Method 5960 was definitely incorporated in the relevant military specifications and was the method provided for testing the molded seams for compliance with contract requirements. Until this time Mr. Shurtleff, author of the specifications, had not been aware that Test Method 5960 contained by reference the phrase “divided by the width of the seam in inches”.
22. Telephone conference No. 2 of September 16. — A subsequent conference by telephone was held on September 16, 1955, between the contracting officer, Mr. Shurtleff, and an Army attorney. The contracting officer’s memorandum for the record reporting the substance of the conference reads as follows:[14]
1. Mr. Shurtleff of K&D Command was contacted by telephone regarding a problem in connection with an interpretation of adhesion test results as raised by the contractor. Mr. Shurtleff stated that after examining the pertinent specification and test methods, there appeared to be some errors in reference to test method 5960 & 5962. He stated that the values in Table I, Specification MIL-P-10747A (QMC) for adhesion on the seams is based on the pounds per indicated seam width.
2. Mr. Moldawer then wanted to know how we could go about destroying or eliminating the erroneous reference to test method 5960 which states that to divide the peak load readings obtained under the adhesion test by the width of the seam in inches. It was this reference upon which the contractor is basing his determination that the requirement for adhesion of the % inch seam need be only % of a pound.
*831 3. Shurtleff then wanted to know what type of mattress they were making and it was explained that they were making a molded C-Beam type. Shurtleff stated that it is the intent of the specification that the C-Beam or molded construction type will carry the values as shown in Table I; however, the wording in the specification does not clearly indicate this. Shurtleff went on to explain that the reference in Specification MIL-P-10747A(QMC) Paragraphs 4.3.3.2.1 and 4.3.3.2.2, wherein Section III, Paragraph 6b(3) is referenced and which reference is deleted by Amendment 2 to the Specification should also have stipulated that only the test method as shown under method 5960 should have been used. The Specification should also have shown that Table I of the Specification would be used for the adhesion values to be obtained.
4. It was agreed there is no clear explanation that could be given the contractor concerning this lack of clarification and Mr. Moldawer stated that it now appeared to be a legal problem insofar as determining what action to take in this matter.
23. Announcement of change orders— On September 21, 1955, the contracting officer wrote plaintiff adhering to his interpretation of the specification requirements for the ^4" seams, suggesting that mattresses with seams possessing an adhesion strength of only % pounds per would be unserviceable, announcing that in the future the plaintiff’s products would be tested at the Government laboratory because of probable inaccuracy of plaintiff’s testing equipment, and further stating that a change order would be issued “to alleviate any areas of conflict caused by any misunderstanding of the specifications”. This letter also notified plaintiff that its delay in starting production could not be considered excusable because the contracting officer had advised plaintiff on August 15 that its preproduction sample mattress had been approved.
24. Resumption of performance. — Having directed Haartz-Mason on August 15,1955, to stop coating, and having in the meanwhile received from Haartz-Mason “several different samples of coating formulas to obtain the required testing results”, plaintiff advised Haartz-Mason to resume coating on September 22,1955.
25. Letter of September 26 re change orders. — On Septem *832 ber 26, 1955, the Quartermaster Research and Development Command advised the Philadelphia Quartermaster Depot in part as follows:[15]
* * * It has been determined that clarification is needed because of cross references to CCCT-191. Action has been taken by this Command to change subject Spec, as follows:
Amendment #2, page 3, lines 12 and 14 — after “method 5962 of ”, add “except that paragraph 5.1 of referenced method 5960 shall be changed to delete ‘divided by the width of the seam' in inches’.”
26. Change orders. — On September 29, 1955, plaintiff received Modification — Change Orders dated September 23, 1955, Nos. 4 and 6, on the two contracts in suit, reading identically, as follows:
Table I of Specification MIL-P-10747A (QMC) 29 October 1951, is applicable for the maximum and minimum requirements for tests as specified therein. Paragraph 5 and 5.1 of Test Method 5962, Federal Specification CCC-T-191b, 15 May 1951, as referenced by Amendment 2, dated 23 September 1954, to Military Specification MIL-P-10747 A (QMC) dated 29 October 1951, are deleted, and the following is substituted: “Adhesion of specimen — The adhesion of the specimen shall be the average of the five highest peak loads of resistance or if the number of peak loads is less than five, the average of the lesser number of peak loads of resistance registered for three inches of separation when strapping is pulled away from the seam and the resistance to such separation registered by means of the auto-graphic recording device.
The foregoing change orders, which provided no increase in compensation, primarily eliminated from Test Method 5960 the phrase “divided by the width of the seam in inches”.
27. Price adjustment reguest. — Under date of October 19, 1955, plaintiff requested of the contracting officer an adjustment of prices on account of alleged increased costs in the amount of $0.369329 per unit. On July 14, 1956, plaintiff reduced its claim for increased costs.
28. Time extension reguest. — Plaintiff had requested of the contracting officer on October 12, 1955, an extension of *833 75 days’ time under the contracts, to which the contracting officer replied on October 21, 1955, requesting a detailed explanation. Under date of November 8, 1955, plaintiff summarized the reasons for its request of a 75-day extension, as follows:
1. We spent about two months from the receipt of the contracts dated 17 June to 15 August, the day we talked to Captain Hersh on the telephone, on the assumption that the specification’s requirements of adhesion were 3 pounds per 1", whereas on that day we were advised by Captain Hersh it was intended as 3 Pounds per a loss of about two months’ time.
2. We directed Haartz-Mason on August 15th to stop coating nylon until the specifications could be clarified and the matter resolved. On 22 September we advised Haartz-Mason to resume coating after we had had several different samples of coating formulas to obtain the required testing results, a loss of about thirty-five days.
3. We lost another thirty days in experimenting, readjusting our operations to the new coating formulas and specification requirements.
29. Completion of contracts. — Contract QM-5756 was completed January 17, 1956, and Contract QM-5757 was completed May 4,1956.
30. Contracting officer’s fundings. — Under date of August 27, 1956, the contracting officer made his findings of fact and decision, the latter reading as follows:
Therefore, in the exercise of his best judgment, it is the finding and decision of the undersigned Contracting Officer that your claim cannot be considered valid, in that the seam adhesion requirements as set forth in MIL-P-10747A, which is the end item specification, is clear and unambiguous; that Federal Specifications CCC-T-191b is a general specification covering the Test Methods only and the particular Test Method 5960 referenced in MIL-P-10747A may well be applied to testing of other end items, as well as mattresses; and that the deletion of reference to “width of seam in inches” from the section relating to reports cannot be construed as the elimination of an ambiguity of specification, but is merely a clarification of the application of the reporting method to this particular end item.
31. Appeal to ASBCA. — Under date of September 24, *834 1956, plaintiff duly appealed to the Secretary of the Army from the findings of fact and decision of the contracting officer. On February 20, 1958, the Armed Services Board of Contract Appeals rendered an opinion and decision denying plaintiff’s appeal. On March 28, 1958, the plaintiff’s request for reconsideration was denied. In essence, the Board held that the direction in line 23 of Table I — Requirements for Coated Fabrics (finding 4(a), supra) — that the 14" molded seams withstand a pull of at least three pounds was clear and unambiguous, and that the method of computing adhesion prescribed in Test Method 5960 (finding 4(e), supra) was not applicable.
32. Preparation of specifications by Mr. Shurtleff. — At the trial in this court a Mr. Shurtleff testified as one of defendant’s principal witnesses. Except for an absence during World War II, Mr. Shurtleff had been employed by the Army Quartermaster Corps since 1941 as a technician in the field of research and development activities relating to improvement of military clothing and associated equipment. For the last 11 years he had been chief of the Films and Coated Fabrics Section of the Quartermaster Research and Development Command.[16] He had prepared the military specifications for the first version of the pneumatic mattresses which provided for cemented seams instead of molded seams, which latter came into use about 1949. Thereafter, he prepared the version of the military specifications incorporating molded seams which are in issue here. In order to determine the seam adhesion strengths set forth in Table I (finding 4(a), supra) for molded seams, an experimental contract without fixed specifications was let to a manufacturer. When these mattresses were successful in field tests, identical mattresses from the same production were subjected to destructive tests, and the adhesion characteristics found were incorporated in Table I of the military specifications. In transposing to Table I the empirical data obtained from field testing there was no effort made to employ engineering theory so as to obtain seams which would be of a standard strength proportionate to their width, i.e., so that they would theoretically have identical bursting points on the application of a *835 given internal air pressure. Mr. Shurtleff was also the author of Amendment No. 2 to the specifications which incorporates into the contracts in suit by reference Test Methods 5980 and 5962 of Federal Specification CCC-T-191b (finding 4 (d) and (e), supra).
33. Standard relationship between various adhesion requirements. — When manufacturing the coated fabric to meet military specifications and the adhesion requirements of Table I prior to the change orders to the contracts in suit, Haartz-Mason believed there was some standard relationship between the adhesion requirements of the coating to the fabric, and the adhesion requirements of the seams, according to its understanding of the test methods contained in Federal Specification CCC-T-191b. Still according to its interpretation of the specifications, Haartz-Mason felt that the change orders to the contracts destroyed any standard strength relationship between the seams, because in theory if both 14" and %" molded seams are required to withstand a minimum pressure of three pounds, then the seam is proportionately stronger than the %" seam. Moreover, if the 14" seam were to- withstand a test of 12 pounds per inch, as the defendant interpreted the specifications to require, this would not be proportionate to an adhesion requirement of four pounds per inch which the specifications provided for the adhesion of the rubber coating to the fabric.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a 'part of Ithe judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Buie 38(c).
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on April 17,1964, that judgment be entered for the plaintiff for $22,500.

 The significant new evidence is reflected in findings 21 and 22. It shows that the defendant’s representatives recognized, in the midst of the controversy with plaintiff, that the specification in question was neither clear nor unambiguous, but in fact was erroneously worded (from the viewpoint of the Government).
At the request of the court, the parties have filed supplementary mem-oranda on the effect of Bianohi on the present case.

 There is, of course, nothing to prevent the Government from omitting a finality clause from all or any one of its contracts.

 See United States v. Wunderlich, 342 U.S. 98 (1951); United States v. Moorman, 338 U.S. 457 (1959); United States v. Holpuch Co., 328 U.S. 234 (1946); United States v. Blair, 321 U.S. 730 (1944); United States v. Callahan Walker Construction Co., 317 U.S. 56 (1942); Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 393 (1916); Plumley v. United States, 226 U.S. 545 (1913); Ripley v. United States, 223 U.S. 695 (1912); United States v. Gleason, 175 U.S. 588, 602 (1900); Sweeney v. United States, 109 U.S. 618 (1883); Kihlberg v. United States, 97 U.S. 398 (1878).

 Rule 15(b) of our Kules requires a party affirmatively to set forth “accord and satisfaction, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, res judicata, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.”

 In cases in which the administrative authorities have failed or refused to determine a dispute which should have been decided under the Disputes article of the contract, the courts have customarily made that determination for themselves. See Brister & Koester Lumber Corp. v. United States, 188 F. 2d 986 (C.A.D.C., 1951) ; Maxan Dress Corp. v. United States, 126 Ct. Cl. 484, 442, 115 F. Supp. 439, 443 (1953) ; United States Casualty Co. v. United States, 107 Ct. Cl. 46, 68, 67 F. Supp. 950, 954 (1946) ; Manufacturers’ Casualty Ins. Co. v. United States, 105 Ct. Cl. 342, 351, 63 F. Supp. 759, 760 (1946) ; Cape Ann Granite Co., Inc. v. United States, 100 Ct. Cl. 53, 71 (1943), cert. denied, 321 U.S. 790 (1944) ; Thomas Earle & Sons, Inc. v. United States, 100 Ct. Cl. 494, 504-05 (1944) ; James McHugh Sons, Inc. v. United States, 99 Ct. Cl. 414, 431 (1943) ; Karno-Smith Co. v. United States, 84 Ct. Cl. 110, 124 (1936) ; Heid Brothers, Inc. v. United States, 69 Ct. Cl. 704, 712 (1930).

 The record does not satisfactorily explain how the direct machine readings for the %" seams by thei Government and the plaintiff could have been at such variance.

 It was unconvincingly refuted at the trial in this court.

 This question has been intelligently explored in River Construction Corp. v. United States, Ct. Cl. No. 13-56 now awaiting argument before the court on Commissioner Bennett’s opinion, findings of fact, and recommendation for conclusion of law. [See River Construction Corp. v. United States, 159 Ct. Cl. 254 (1962)].

 Birnbaum, Questions of Law and Fact and the Jurisdiction of the Armed Services Board of Contract Appeals, Bled. B.J. 19 :2—Apr. ’59.

 Par. 4 of the Charter of the ASBCA, ASPR, App. A, Part 1 (Jan. 3, 1955).

 Par. (b) of the standard “Disputes” clause, ASPR 7-103.12 (Sept. 5, 1958).

 Mr. Shurtleff was the author of the specifications under examination. His position and experience are described in finding 32, infra.

 The documents quoted in findings 21, 22 and 25 were not in the record before the ASBCA and were not known to plaintiff until produced by defendant in response to a subpoena duces tecum issued by the court.

 See footnote 13.

 See footnote 13.

 Styled Research & Engineering Command at time of trial.