**C. J. LANGENFELDER & SON, INC.**

v.

**The UNITED STATES.**

No. 291–63.

United States Court of Claims.

Nov. 9, 1967.

J. Roy Thompson, Jr., Washington, D. C., attorney of record, for plaintiff; Howard H. Conaway, Thompson, McGrail & O'Donnell and Frank, Bernstein, Gutberlet & Conaway, Baltimore, Md., of counsel.

James A. Pemberton, Jr., Washington, D. C., with whom was Acting Asst. Atty. Gen. Carl Eardley, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

DAVIS, Judge.

■ In C. J. Langenfelder & Son, Inc. v. United States, 341 F.2d 600, 169 Ct. Cl. 465 (1965), we held that plaintiff was entitled to recover additional compensation, at six dollars per cubic yard, for unsuitable soil removed from pipe trenches dug under a contract for grading, drainage, and paving work at the Dulles Airport, including not only such material taken from below the excavation depths shown on the drawings but also within those limits. The case was remanded to the trial commissioner to determine the amount of recovery under Rule 47(c).[1] The trial commissioner has now found that plaintiff removed 25,337 cubic yards of unsuitable soil from the trenches, amounting, at $6 a cubic yard, to $152,022. Plaintiff wholly accepts this finding. Defendant does not dispute the figures as such, but raises several legal defenses which it says would eliminate or reduce the recovery.

■ 1. The Government first argues that the contractor should have done much more to use the excavated unsuitable soil as backfill even though it might have been more convenient to employ other materials as plaintiff did. The point sought to be made is that the contractor did not do all that it reasonably could to utilize the shale and other unsuitable material found in the trenches.[2] The answer is that the trial commissioner properly found (findings 4(b) and 4(c)) that the Langenfelder company employed "standard and acceptable construction practices" in drilling, and that in the circumstances it would have been "impracticable", "expensive", and "uneconomical" to use other means which would have enabled the unsuitable material to be made suitable. These findings are adequately supported,[3] and the legal standard embodied in them is the appropriate one. Where the contract expressly indicates that unsuitable material is not to be used for backfill, a contractor is certainly not held to a duty to "mitigate damages" or to "cooperate with the Government"—as defendant puts it—by taking impractical and uneconomic steps

---

1. This was before United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 430 n. 6, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), ruled that the issue of damages relating to liability "under the contract" should first be determined administratively. The parties have agreed (see finding 1(b) n. 1) to waive any right to an administrative determination and to have the question decided by court trial. Since the issue is not jurisdictional (Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 862–863, 162 Ct.Cl. 802, 806–808 (1963)), this waiver can be and is accepted.

2. In our opinion on liability we were not certain that shale and other unsuitable materials were to be treated exactly alike under the contract. It is now clear that they were all in precisely the same class for the purposes of this litigation.

3. In the administrative proceedings prior to the court action, the Government counsel expressly admitted that it was not practical to act in any other way than plaintiff had proceeded.

to turn concededly unsuitable soil into useful material. Such a standard would be unreasonably burdensome and unanticipated. No contractor reading the agreement in advance would suppose that he would be required to use such impractical and uneconomic measures.

2. Another defense is that plaintiff did not notify the defendant of the claim for removal of unsuitable material, or keep records of the amounts involved, or arrange for the Government to keep such records. This is a point which could and should have been made when the case was earlier before us. All the facts on which defendant relies were known at that time, and the defense, if valid, would have averted a trial on damages (and made unnecessary any ruling on the merits of the issue of liability under the contract). Because of this belatedness, we shall not set forth in detail our reasons (in addition to the untimeliness) for rejecting the argument. Suffice it to say that the Government was properly notified and that in the circumstances records of actual excavation are not a prerequisite to recovery; calculation on the basis of the paylines (as was done here) is an acceptable substitute.

3. The third of the Government's points is that plaintiff should not be allowed the full contract figure of $6.00 for each cubic yard of unsuitable material removed but only that sum less the component of the "contract unit price" (which has already been paid) representing payment for excavation and removal.[4] In other words, defendant insists that the $6.00 figure is a substitute for the normal excavation cost, not an addition to it. Although our opinion on liability does not delve into this question, it assumes that the $6.00 price is additional, rather than alternative.[5] The Administrator of the Federal Aviation Agency, when he first held for plaintiff on liability, also seems to have proceeded on the same assumption.

This is the reading which best fits the contractual terms and purpose. The various "contract unit prices" for pipe (Item 702–5.1) did not cover excavation alone; they were over-all figures "per linear foot", constituting "full compensation" for a large number of components, including "furnishing, hauling, and installing the pipes; for excavation; for bedding; backfill and compaction; for jointing; for connections to drainage structures; for cleanup and for all material, labor, equipment, tools, and incidentals necessary to complete the drain as shown on the plans * * *." The all-inclusive nature of these unit prices has a twofold significance. First, since there is no breakdown for excavation alone, it would seem that the contract did not look toward adjustment of the price for excavation of unsuitable material (which is specifically given in a flat sum) by some unspecified figure for excavating suitable soil. Second, it is natural to assume that the over-all "contract unit price"—covering the whole process of furnishing and installing the pipe—contemplated soil suitable for backfill, especially since the contract makes special provision for paying for unsuitable material. This separate clause covers nothing but removal of unsuitable soil and indicates that compensa-

---

4. In our earlier opinion we mistakenly assumed that $3.93 was *the* "contract unit price" for excavation. There were several "contract unit prices", depending upon the type of work to be done, and these prices covered work other than excavation (including installation of the pipe). The figure of $3.93 appears to represent the cost of excavation included in one of these "contract unit prices."

5. We characterized plaintiff's claim before the Federal Aviation Agency as "a re-

quest for *additional* compensation of $6.00 per cubic yard for all this work" and referred to "*premium* payments for all the unstable soil which it [plaintiff] removed and replaced", to "*extra* payment for the removal and replacement of unstable soil" and to "*additional* compensation for the excavation of unstable soil" (emphasis added). See 341 F.2d at 603, 609, 610, 611, 169 Ct.Cl. at 470, 479, 482, 484.

tion is to be $6.00 "per cubic yard", without qualification or diminution. This flat $6.00 payment seems intended as extra compensation for the additional expense of working with unacceptable substances, which are harder to remove and cannot be used for backfill. If the Government wished to subtract from the $6.00 figure the "normal" cost of removing ordinary material, it should have been much more explicit. Cf. WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876–877, 879, 163 Ct.Cl. 1, 6–7, 10 (1963).

4. Finally, defendant urges that plaintiff should be paid for removing unsuitable material only to the extent that suitable soil was needed to replace it as backfill. Because of the space taken by the pipe laid in the trenches there was necessarily less backfill than the material originally excavated. But the clause on unsuitable soil says unequivocally that "the cost of removing unsuitable soil shall be paid for at the unit price for unclassified Excavation for Structures under Item 752–5.1 [i. e., $6.00 per cubic yard]." There is no restriction to unsuitable soil which is replaced by suitable backfill; on the contrary, the clause goes on to say that the $6.00 price "will *include* all *required* replacement with approved materials as specified * * *" (emphasis added), thus suggesting that in some circumstances there would be no replacement. Moreover, because the cost of removing unsuitable material was higher, even without the necessity for supplying backfill, the contractor would have to be compensated for that more onerous task. The $6.00 figure was apparently chosen to cover both the higher cost of removal and the backfill expense where replacement was required. We do not see the bearing of the sentence (on which the Government leans) saying that "Excavated material not required or acceptable for backfill shall be disposed of by the contractor as directed by the Government." There is no suggestion in that simple directive as to disposal that any of the costs of removing unaccepta-

ble material were to be left uncompensated.

In sum, the Government's objections are all without merit and the plaintiff is entitled to recover $152,022. Judgment will be entered to that effect.