Per Curiam :
This case was referred pursuant to former Buie 45(a), now Buie 57(a), to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for a conclusion of law. The commissioner has done so in an opinion and report filed on March 3,1964. Exceptions were filed by the defendant, briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court agrees with the commissioner’s findings, his opinion, and his recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover and judgment is entered for the plaintiff in the amount of thirty-nine thousand, seven hundred fifty-four dollars and two cents ($39,754.02).*
Opinion op Commissioner
The central question here is whether a manufacturer of rubber terrain maps under contract with the Army may recover the increased costs of latex, the principal raw material ingredient, brought about ’as an economic byproduct of the Korean war during a period of Government-caused delay in inspection and approval of a preproduction model, where despite the delay the contractor still managed to perform within the contract time limits. United States v. Blair, 321 U.S. 730 (1944) says (to the defendant) he cannot, while Metropolitan Paving Co. v. United States, 163 Ct. Cl. 420, 325 F. 2d 241 (1963), says that he can, but as we shall *500 see tbe conflict is more apparent than real and rests upon a difference in operating facts.
Antecedent to this is whether the plaintiff prime contractor may maintain this action on behalf of its subcontractor Toyad, for the uncompensated loss was Toyad’s. The subcontract contains no provision resembling the exculpatory type of clause which freed both the prime contractors and the Government from liability in such oases as Severin v. United States, 99 Ct. Cl. 435 (1943), cert. denied, 322 U.S. 733 (1943); Continental Illinois National Bank & Trust Co. v. United States, 112 Ct. Cl. 563 (1949), 81 F. Supp. 596; Continental Illinois National Bank & Trust Co. v. United States, 126 Ct. Cl. 631, 115 F. Supp. 892 (1953). Quite logically where the subcontract absolves the prime contractor from liability to his subcontractor there can be no derivative liability of the Government to the subcontractor even where the Government would otherwise be culpable, for actual damage to the prime is a prerequisite to recovery either for himself or for those subordinate to him. Where the subcontract does not negate liability of the prime to his sub (J.W. Bateson Co. v. United States, 143 Ct. Cl. 228, 163 F. Supp. 871 (1958)), or where it is silent as to such liability (J. L. Simmons Co. v. United States, 158 Ct. Cl. 393, 304 F. 2d 886 (1962)), recovery against the Government by one on behalf of another is generally permitted. Thus the present action may be maintained by the plaintiff for Toyad.
The Government misled and then delayed the plaintiff unreasonably. While desiring the production of latex terrain maps with a smooth surface, the Government inadvertently led the plaintiff astray at the outset by advising it to bid on the basis of a prototype produced by the Army Map Service which had a rough and pebbly surface. The plaintiff predicated its low bid on a fixed-price subcontract with Toyad for latex, which Toyad in turn based on the prevailing market price with a reasonable margin for normal increases. All of this was in 1950 on the eve of the Korean war which started June 25,1950, although the contract itself was entered into in July and backdated to June 26, 1950. The price of latex advanced rapidly from then to the end of the year when price controls were instituted. Toyad could not adequately *501 protect itself against price advances by purchasing and storing all of its contract requirements for latex, for although it had sufficient storage facilities it is not considered feasible to store latex for longer than four months because of its perishable nature, even under controlled conditions. Toyad actu- ’ ally ordered its total latex requirements prior to the Korean war and so insured its availability when needed, but the price at the time of delivery governed, and naturally Toyad was reluctant to run the risk of spoilage should circumstances prevent use of the latex during its storable life. The plaintiff submitted for inspection a preproduction sample map on August 30, 1950, which was eventually rejected because of the discovery by Army afterthought that the surface was too rough to ^ permit marking of roads, etc., with an ink roller, even though it was faithful to the surface texture of the prebid Army prototype. The contract nowhere described the desired surface texture, nor did it affirmatively require the texture to be such as. to take markings from an ink roller. The inference that the contractor should have divined this requirement from the fact that it was to provide ink rollers as part of the map kit is more than countervailed by the direction to copy the prebid prototype, the only tangible clue the Government had provided as to the surface texture it wanted.
The plaintiff’s preproduction sample rejected by the Government following the inspection on August 30, 1950, represented the end product of an elaborate sequence of models, plaster molds, and cast aluminum production molds. Rejection on grounds of surface texture meant the scrapping of the aluminum molds and the repreparation of a new surface for the plaster mold, followed by recasting the aluminum molds. These were expensive and time-consuming operations. Their difficulty was enhanced by the -inexplicable'failure of the Government to advise the plaintiff of the surface it wanted or how it was to be achieved. By December 1950 the plaintiff prepared additional preproduction samples having a smoother surface texture, but through further procrastination on the Government’s part the final approval for production was withheld and not issued until February 19, 1951, while under conditions of reasonable cooperation -ap *502 proval should have been forthcoming about November 1, 1950. On the one hand the Government expressed to the contractor its urgent need for the maps for military training purposes, on the other by its failure to act it delayed the contractor’s performance, and all the while the cost of latex was zooming until it was stabilized by a price freeze on January 1, 1951. By issuing a change order in June 1952 officially defining for the first time the desired surface texture and providing for the payment to plaintiff of $5,505.51 as an equitable adjustment for the cost of changing molds the defendant by strong implication admitted not only that it had changed its original surface texture requirements, but also that it was capable of reducing the description of the desired surface texture to writing. It did not, of course, admit to unreasonable delay in the circumstances surrounding the change, but this is abundantly clear in the report of facts accompanying this opinion.
The plaintiff proceeded with dispatch on receiving production approval on February 19,1951, and met all the delivery requirements of the original contract which specified deliveries commencing March 28, 1951. The requirement of the original contract for a production test model to be ready on or before February 28, 1951 was also met, in spite of the delays which had been experienced. Obviously the Government in fixing these dates last referred to either overestimated the time requirements badly, or underestimated the plaintiff’s capacities, for had it not been for the delays the plaintiff would have been able to complete the contract long-before its formal requirements.
It is this circumstance that causes the defendant to rely on United States v. Blair, supra, where it was held that nothing in the contract required the Government to aid plaintiff in completing his contract prior to the contract completion date and that damages claimed for delay could not thus be sanctioned. In that case a delinquent Government contractor delayed the plaintiff, and the court ruled that “Nowhere is there spelled out any duty on the Government to take affirmative steps to prevent a contractor from unreasonably delaying or interfering with the attempt of another contractor *503 to finish ahead of bis schedule.” This is readily distinguishable from the case under consideration, for here it was the Government itself which was at fault for the delays and not another contractor. The plaintiff’s contract required the Government to make inspections and tests “in such manner as not to unduly delay the work.” This promise, plus the obligation implied in every contract that the Government shall not hinder the contractor in his performance, have been breached through no fault of an intervening or independent third party. In Metropolitan Paving Co. v. United States, supra, a case more comparable to the present, the court distinguished the Blair precedent in these words, 163 Ct. Cl. at 423:
But a close reading of Blair, supra, does not support defendant’s position. While it is true that there is not an “obligation” or “duty” of defendant to aid a contractor to complete prior to completion date, from this it does not follow that defendant may hinder and prevent a contractor’s early completion without incurring liability. It would seem to make little difference whether or not the parties contemplated an early completion, even whether or not the contractor contemplated an early completion. Where defendant is guilty of “deliberate harassment and dilatory tactics” and a contractor suffers damages as a result of such action, we think that defendant is liable.
On June 11, 1954, the Armed Services Board of Contract Appeals dismissed plaintiff’s appeal from the adverse decision of the contracting officer. The decision was based on a rigid application of the Blair decision. Thus the Board decision was purely on a question of law and offers no barrier of finality under the disputes clause.
Time and events have somewhat eroded the much-maligned doctrine of United States v. Rice, 317 U.S. 61 (1942), but even granting its continued health and vitality its restriction of a contractor to a mere time extension as full contract payment for the financial consequences of reasonable delay flowing from a change order does not apply to preclude monetary damages for that part of a delay found to be unreasonable. In failing to expeditiously order the plaintiff to change the *504 surface texture, in failing to instruct the plaintiff as to precisely what it wanted, and in its dilatory and inconclusive inspection and approval procedures as described in the findings, the Government exceeded reason and brought itself within the scope of F. H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 506, 130 F. Supp. 394, 397 (1955) :
* * * It is settled that the defendant is allowed under the contract only a reasonable time within which to make permitted changes in the specifications' and that the defendant is liable for breach of its contract if it unreasonably delays or disrupts the contractor’s work.
The final issue is whether the increased latex costs which the plaintiff seeks as a measure of his damages were the proximate result of the defendant’s breach, or were consequential to the Korean war and thus not recoverable under one way of construing Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854), and Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353 (1951), cert. denied, 343 U.S. 977 (1952). Had the Korean war not occurred and general conditions affecting the price of latex remained normal, it is likely that the price would have remained within the margin which plaintiff had allowed in the computation of its bid, and so no damage could be shown to have resulted from the Government’s delay, assuming that no other damages were claimed.' In this sense it could be said that the plaintiff’s damages resulted from the Korean war and not from the defendant’s contract-breaching conduct. But the reasoning is specious, for war is but one of many causes of cost increases, most of which causes are beyond the sphere of Government participation but are instead the product of economic or political conditions no more subject to Government control than is an unwanted war. As an example, artificial price increases inspired by a conspiracy among producers might have boosted latex prices and given the Government reason to label thetii as consequential to the conspiracy and not proximate to the breach, and hence not reimbursable. The true concept of consequential damages involves consideration of the type of loss foreseeable by the contracting parties at .the time of their *505 agreement. When the Government contracts it implies an obligation to respond in damages for any unreasonable delays which it may commit during contract performance, including increased material costs as in the present case. The cause or cost of such increases is not in every case material to and does not determine their foreseeability. There may even be valid reason to fix the foreseeability at the time of the breach rather than at the time of the agreement, for it is at the breach time that the consequences of wrongdoing are more apparent and assessable, and the deterrent accordingly greater. To illustrate, if the concrete results of delay in the form of war-inflated prices were not apparent to the Army when it awarded plaintiff the contract in suit just prior to the outbreak of the Korean war, most certainly the consequences became obvious in September 1950 when the breach occurred, for by then latex prices were on a rapid rise and the Army’s risk more palpable. The parties have suggested no precedent where war-borne increases in the price of materials have been considered consequential to the war, and not the result of delays by the Government, so as to preclude their recovery. In Levering & Garrigues Co. v. United States, 73 Ct. Cl. 566 (1932), the increase in cost of bricks during a period of delay by the Government was considered a recoverable item of damages without inquiry into the cause or foreseeability of the increase. Such claim items are common in Government contract actions for delay-damages; contentions that they are not recoverable because they are consequential rather than proximate are not.[1] . For a more extended discussion of the doctrine of consequential damages as it applies in Government contract cases, see Appeal of Carteret Work Uniforms, ASBCA No. 1015, decided July 25, 1952, and Law of Government Contracts, McBride & Wachtel, Yol. IY, Chapter 32.
Findings 53 through 70 relate to the ascertainment of the plaintiff’s damages. Based on the conclusion that the Gov *506 ernment’s approval of the plaintiff’s product for production on February 19,1951 was due on November 1,1950, and that the plaintiff’s damages are measured by the increased cost of its latex purchases in the later period, the plaintiff is entitled to recover the sum of $39,754.02 as damages for the defendant’s breach of contract.
FINDINGS OF FACT CONTENTS

Finding No.

1. The prime contractor_
2. The subcontractor-
Development and Procurement of the Terrain Model Kits
3. Inception_
4. Novelty_
5. Army Map Service responsibility_
6. Surface texture_
7. Texture experiments_
8. Plaintiff’s Exhibit A_
9. Stippled surface_
10. Thirty prototypes_
11. Quantity production_
12. Invitation; prototype inspection_
13. Subcontractor’s proposal to plaintiff_
14. Bid opening results_
15. Production time estimates_
16. Facilities inspection and approval_
17. Bid acceptance:_
18. Contract award_
19. Contract provisions_
20. Specifications_
21. Rough surface texture of prototype tit_
Events After Bid Opening to August 30, 1950
Rubber purchase_ bO to
Loan of hilltop sections_ tO CO
Loan of sample aggregate_ bO ^
Method of using aggregate_ tO C*
Preparatory time_ tO p
Latex price inflation_ bO M
Surface texture compliance of plaintiff’s preproduction test model_ tO 00
*507 Unseasonable Government Delay

Finding No.

29. Inspection on August 30, 1950-
30. Inspection of September 5 and 6, 1950-
31. Inspection criteria-
32. Request for decision-
33. Demands for early delivery-
34. Id_
35. Meeting of September 29, 1950-
36. Id_
37. Inspection of October 9, 1950-
38. Inspection of October 25, 1950-
39. Inspection of October 30 and 31, 1950-
40. Formal disapproval of plaintiff’s first preproduction models.
41. Letter of November 3, 1950_
42. Revision of preproduction molds-
43. Delay December 1950-January 1951-
44. Request for equitable adjustment_
45. Formal approval of models-
46. Toyad’s rubber claim-
47. July 1951 conference-
48. Denial by contracting officer_
49. Proposed Change Order 5-
50. Rejection of Change Order 5-
51. ASBCA decision_
52. Acceptance of Change Order 5-
Damages
53. Bid estimate_
54. Id___
55. Rubber compound change-
56. Initial purchase of latex requirements-
57. Latex storage capacity-
58. Latex purchases 1950-1951-
59. G.R.S. purchases 1950-1951-
60. Latex in storage-
61. Description of mold production cycle-
62. Production pouring time to completion-
63. Rubber consumption in actual performance-
64. Recapitulation of delays, August 30, 1950, to February 19, 1951_
65. Commencement of production run-
66. Delay total-
67. Blame_
68. “But for” production readiness-
69. Extra latex costs--
70. Net damages_
*508 Findings of Fact
1. The ■prime contractor. Plaintiff, Gardner Displays Company, is a corporation organized and existing under the laws of the State of Pennsylvania and files this suit for the use and benefit of Toyad Corporation of Latrobe, Pennsylvania.
2. The subcontractor. Toyad Corporation, a subcontractor of plaintiff as hereinafter set forth, is a corporation organized and existing under the laws of the State of Pennsylvania and at all times material hereto has been engaged in the manufacture of rubber products. Toyad Corporation will hereinafter be referred to as Toyad.
Development and Procurement oe the Terrain Model Kits
3. Inception. At some time during 1948 or the early part of 1949 CONRAC, Continental Headquarters of the Department of the Army, sought to obtain a more flexible terrain training aid to replace the sand table models then in use. The training aid was to be used in the classroom by instructors and students for training in tactical military situations.
,4. Novelty. The development and procurement of the training aid were novel for it was the first time that a rubber map had been designed as a training aid to replace the sand table used by the Army in teaching tactics. It was the first and only time that a mass production contract for foam rubber terrain maps had been issued.
5. Army Map Service responsibility. Written instructions issued by the Office of the Chief of Engineers to the Army Map Service for the development of the training aid were apparently destroyed in the normal course of business and were thus not available at trial. However, the instructions issued to the Army Map Service were “to produce this training aid' for the purpose it was to serve, as a textured surface which could be written on, being brown toned in our conventional sense — this was terminology that we as a technical group understood — and they set to work to produce this.” -
*509 6. Surface texture. The surface texture of the training aid was to be designed to represent a grass type of texture, a roughness of the surface. The Army Map Service and the Corps felt that it would be desirable for the map to be able to take markings to denote roads, air strips, etc., to demonstrate military problems.
7. Texture experiments. The development phase was carried out at the Offices of the Army Map Service in Washington, D.C., in 1949 and 1950. During this period of time a number of experiments were conducted on surface texture and on other aspects of the kit by personnel at the Army Map Service prior to the production of the smooth surface prototype, and several early versions were produced with a rough and pebbly surface texture. During the course of these experiments, the Army Map Service used aggregates and stippling to achieve various surface textures.
8. Plaintiff’s Exhibit A. An example of a rough surface texture achieved during this experimental period is Plaintiff’s Exhibit A, which is discussed in more detail in a subsequent section of this report. Plaintiff’s Exhibit A is a base section of an entire kit produced by the Army Map Service with a rough and pebbly surface texture sent to plaintiff in January 1951 as a paint guide (finding 22, infra). It was considered a defective reject by the Army Map Service, unknown to plaintiff.
:9. Stippled surface. After numerous experiments, which included the use of aggregate, aggregate with stippling, and stippling alone, the Army Map Service finally adopted stippling as a means of achieving the relatively smooth surface texture of Defendant’s Exhibits 46 and 47. However, the same surface texture could have been less efficiently achieved with the use of aggregates of the right size. An ink roller was applied to this stippled texture and the markings were acceptable.
10. Thirty prototypes. Approximately 30 map kits were produced by the Army Map Service and shipped to various military posts. In general the four base sections of the kit were contoured 30-inch squares made of sponge rubber so contrived that they could be variously combined to portray *510 different terrain configurations. Separate sponge rubber hill sections, tree and bush clumps, etc., permitted a variety of alterations in the terrain. The kits were received with enthusiasm and the Office of Chief of Engineers issued instructions for the item to be made a standardized item for the Government to procure in quantity.
11. Quantity production. Since the reproduction facilities at the Army Map Service were not adequate to supply the procurement needs of the Army, plans were formulated for commercial production of the item. One of the difficult problems in preparing the specifications was that of describing the desired surface texture. Ultimately the specifications did not specify the type of surface texture.
12. Invitation; prototype inspection. On or about April 18, 1950, defendant, through the Chicago Procurement Office, Corps of Engineers, Department of the Army, issued to plaintiff and other prospective bidders its Invitation No. DA-ENG-11-184, ENG-B-50-1189, which invited bids for supplying to defendant 3,230 Universal Terrain Boards, a training aid, together with a large quantity of components and accessories, each complete board being also known as a kit, all to be in accordance with certain drawings and specifications referred to in the invitation and to be in accordance with a prototype except in certain particulars hereinafter referred to. Two of the components "were described as the “base” and “hilltop” sections. Prior to and after award of the contract, the quantity was increased on several occasions, so that the quantity finally required and delivered under the contract was 3,584 kits. Along with the invitation, defendant issued to bidders an undated letter which advised that a prototype for the kit was available for inspection at the Chicago Procurement Office of the Corps of Engineers and which expressly enumerated certain defects which would be cause for rejection of production items. The letter contained no reference to surface texture of the base and hilltop sections of the prototype kit as a ground for rejection, or indicated that its texture deviated in any way from the surface texture desired by defendant.
13. Subcontractor's proposal to plaintiff. On May 16, 1950, Toyad Corporation submitted to plaintiff its proposal to furnish Terrain Model sets at $37.33 per set, each set con *511 sisting of four base sections and edgbt hilltop sections. Plaintiff was to furnish the necessary molds.
14. Bid opening results. On May 29, 1950, the bids for Contract No. DA-ll-184-Eng-3021 were opened at the Chicago Procurement Office, 226 West Jackson Boulevard, Chicago, Illinois, and plaintiff’s bid was low. On that same day, plaintiff notified Toyad of the results of the bid opening and orally accepted Toyad’s quotation of May 16,1950. Subsequently, plaintiff issued its purchase orders for 3,900 sets of shrubbery, bushes, trees and hedges, and for 3,600 sets of terrain maps and hilltop sections, in the total amount of $134,388.80.
15. Produotion time estimates. Plaintiff agreed to furnish Toyad with molds of the base and hilltop sections approximately three months after award of the contract. Actual production of the first set of molds, including the production of rubber castings, required a total of 80 calendar days from June 10, 1950 to August 30,1950. Toyad agreed to complete delivery under its subcontract within four to five months after receipt of the molds. Actual experience proved this estimate correct for it ultimately took 127 days for production of the base sections which were the chief item.
16. Facilities inspection and approved. On or about June 8, 1950, prior to the award of the contract, the.Government made a preaward survey of the facilities of plaintiff and Toyad to determine if their facilities were adequate to perform the contract. The facilities were found to be adequate to fulfill the requirements of this contract.
17. Bid acceptance. On June 10,. 1950, defendant accepted plaintiff’s bid in the amount of $618,334.29. Immediately thereafter plaintiff began its work by setting up production lines.
18. Oontract award. In July 1950 a formal contract, No. DA-11-18A-ENG-3021, was executed by the parties and backdated to June 26, 1950, the day after the outbreak of the Korean war.
19. Oontract provisions. The contract contained standard provisions for Changes, Default and Disputes. It designated the Chief of the Pittsburgh Procurement Office as the authorized representative of the contracting officer, with certain limitations on his power. It directed the contractor to *512 place all required subcontracts promptly and to furnish, the defendant a proposed production schedule which would insure compliance with delivery requirements. It required delivery of completed units at intervals from March 28, 1951, to June 28,1951, except as to certain components which were to be delivered by December 28, 1951. A production test model was required on or before February 28, 1951. Increases in quantities at the defendant’s option were authorized up to 25 percent. Inspections and tests by the Government were required to be performed “in such manner as not to unduly delay the work.”
20. Specifications. Pertinent parts of the military specifications material to this claim are as follows:
8.4 Production test model. — As soon as practicable after award of contract or order and prior to submission of any complete unit for final acceptance, the contractor shall furnish one complete unit for test to determine conformance with the requirements of this specification. Approval of the production test model by the bureau or service concerned shall not relieve the contractor of his obligations to supply equipment conforming to the requirements of this specification.
3.5 Base and hilltop sections. — The base and hilltop sections shall each consist of a shell or skin of latex rubber, approximately ys-inch thick, formed to give the contours shown on the drawings for representing mountains, hills, valleys, and general terrain conditions. This .‘shall be held in undistorted relationship, when in a relaxed position, by a backing or reinforcement of foamed latex sponge rubber, which shall be adequately and permanently secured to the shell. The exposed surface of the shell shall be painted in colors as specified herein.
¡21. Bough surface texture of prototype Mi. The surface texture of the prototype kit on display in Chicago prior to and after the opening of the bids was rough and pebbly, and plaintiff was initially instructed to produce a kit which had a similar surface texture. This is a conclusion drawn from widely disparate evidence in the record, but substantially supported by the -weight of the evidence as it is -accurately summarized in plaintiff’s requested findings. The 30 prototypes of the map kit which were prepared from one set of molds by the Army Map Service and distributed to various *513 military installations (findings 8-10, supra) had a surface texture achieved by a stippling process which was notably smoother than the surface texture of the prototype kit on display at Chicago. The disparity created a minor mystery, since rubber castings produced from the same mold would be expected to have identical surface textures. However, the probable explanation of the pronounced difference is that, prior to its production of 30 prototype kits, the Army Map Service experimented with various texturing methods, including the use of coarse aggregates instead of stippling. There was a limited production of these rougher textured castings. In some way not accounted for the prototype kit on display in Chicago must have been one of the experimental kits produced by the Army Map Service which had. a rough, and pebbly surface, instead of one of the smoother surfaced kits ultimately produced by the Army Map Service as, final' prototypes. At the outset of trial there were no physical exhibits available for the record representing the 30 prototypes made by the Army Map Service, or the prototype kit displayed in Chicago. All copies had long since been lost. During the course of trial one of the former officials of the Army Map Service who appeared as á defendant’s witness chanced to come across several rubber castings which were components of the 30 prototypes with a fairly smooth stippled surface. They had been providently rescued from the trash and in the intervening years had been used by tile witness’ children as decorations around the Christmas tree! In the concluding trial session one of the plaintiff’s former employees produced a rubber casting of a base section which had been sent to plaintiff in January 1951 by the Army Map Service as a coloring sample. This section had a rough and pebbly surface texture identical with the texture of the prototype kit on display in Chicago,, and so had the same experimental origin in the shops of the Army Map Service. This section was discovered in storage in the plaintiff’s witness’ garage, and the sole reason for its preservation was that the witness had used it for archery target practice! The chance discovery of these products of the Army Map Service was as remarkable as it was useful in solving an otherwise mysterious conflict in testimony.
*514 Events After Bid Opening to August 30, 1950
22. Rubber purchase. On June 5,1950, immediately after the bid opening, which, took place on May 29, and prior to contract award, Toyad placed its purchase order with Xylos Rubber Company for five 10,000 gallon carloads of rubber, and a 12,000 gallon storage tank was installed. The five tank carloads were purchased for this contract and were more than sufficient to meet the requirements of this contract. The purchase price was 37 cents per pound.
23. Loan of hilltop sections. On June 19,1950, the Army Map Service in Washington, D.C., shipped to plaintiff “a rubber casting of the hilltop sections to be included in the Terrain Model Kits.” They were used by plaintiff as a guide in the development of the proper contours and elevations for the hill sections. They were not used as a guide for surface texture. This surface texture was smoother than that of the prototype kit exhibited in Chicago.
24. Loa/n of sample aggregate. Shortly after award of the contract, defendant’s representatives furnished plaintiff with a sample of the aggregates which had been used by the Army Map Service to produce the . surface texture of the Chicago prototype, and also furnished plaintiff with a sample of the base and hilltop sections of the prototype. Nothing but a rough, pebbly surface could have been produced with the aggregate furnished as a sample to plaintiff.
25. Method of using aggregate. The method employed by the Army Map Service of producing the mold with the required texture was by the application of ground-up latex and sawdust to a certain mesh size which was applied to the surface of the model from which the mold was made. As stated in finding 24 above, a sample of this aggregate was furnished plaintiff. Using this aggregate so obtained as the basis to produce the required surface texture, plaintiff proceeded to fabricate and mold the models from which a set of molds, for the base and hilltop sections, were made.
26. Preparatory time. Plaintiff began its work on the preparation of molds on or about June 10, 1950, and the aluminum production molds were ready for Toyad to use in the production of a preproduction model in August of *515 1950. Tlie kit was ready for inspection on August 30, 1950. Thus the total time for preparation and production of the molds and models was approximately 80 calendar days. This period of time was reasonable.
27. Latea price inflation. Prior to June of 1950 Toyad’s natural rubber purchases were from 24.5 cents to 26.5 cents per pound. However, immediately after the outbreak of the Korean war on June 25, 1950, the price of latex commenced to rise rapidly and continually as a result of war conditions and controls imposed by defendant in its sovereign capacity. Defendant at all times was fully aware of the rapid and drastic upward spiral in the market price of latex which followed the outbreak of the war. The price was fixed by the Government on January 1,1951, at 84.5 cents per pound.
28. Surface feature compliance of plaintiff's preproduction test model. The base and hilltop sections of plaintiff’s first production test model inspected by the Government on August 30 and again on September 5 and 6,1950, had a rough and pebbly surface texture like that of the Government’s model on display in Chicago at the time of the bid and thus complied with the contract requirements as to surface texture. No sample of the plaintiff’s first preproduction test model kit was available as an exhibit at trial.
Unreasonable Government Delay
29. Inspection on August SO, 1950. On August 30, 1950, at the offices of plaintiff in Pittsburgh, defendant’s representatives inspected the preproduction test model of the Universal Terrain Map which consisted, among other items, of the four base and hilltop sections produced by Toyad from molds furnished by plaintiff. The inspection consisted of an examination of the various components of the preproduction kit, the size and conformation of the base and hilltop sections, matching of the base sections, and the surface texture of the rubber. Prior to the application of the inked roller to the surface of the base sections, there was general approval of the surface texture. However, upon the application of the inked roller to the surface of the base section it was discovered that a satisfactory impression could not be made on the base sections because of surface roughness. As *516 a result, the Government stopped production pending another inspection.[1] At this inspection, the Government’s representatives admitted that the surface of the base and hilltop sections produced by plaintiff and Toyad was rough and pebbly as required, as was the case with the samples of the prototypo and aggregate previously furnished plaintiff.
30. Inspection of September 5 and 6, 1950. On September 5 and 6,1950, a second inspection was made by defendant of the preproduction models of the base and hilltop sections. At this inspection Mr. Spooner, an expert for the Government, was present and conducted the inspection. At this inspection the application of an inked roller to the surface of the base sections again revealed that it was not possible to drive the inking mechanism over the surface of the model and leave a clean delineated highway symbol. Production was stopped pending a decision from the Government on what surface texture it desired. At this inspection no definite instructions were given to plaintiff, although it was suggested that the method of stippling with a paint be tried. The Government’s expert testified that he “did not know what advice to give for an immediate result.” It was also suggested by the Government that plaintiff undertake its own texturing research program.
31. Inspection criteria. In connection with this and subsequent inspections, there were no criteria for inspection of the preproduction model produced by plaintiff. The contract was assigned to the Pittsburgh District of the Corps of Engineers for supervision and inspection. Since this was a new and different item, the Pittsburgh District was to be furnished criteria through the contracting officer. However, at the beginning of the contract the Pittsburgh District had no criteria. Even as late as October 1950 the local inspector in Pittsburgh had not received any explicit instructions regarding inspections.
32. Bequest for decision. On September 19, 1950, plaintiff wrote defendant as follows:
With reference to our recent conferences regarding the approval of certain items of the Terrain Kit Model, *517 we are quite anxiously awaiting the decisions that may have been made in order to proceed with the manufacture of the molds that will be required and would appreciate very much your expediting, at your early convenience, this program to its conclusion so that we may proceed.
We have sincerely appreciated the cooperation you and Mr. Spooner have so generously given us and will attempt to the best of our ability to make delivery ahead of the proposed delivery schedule as outlined in our contract.
33. Demands for early delivery. Before and after award of the contract and especially after the outbreak of the Korean war, defendant’s authorized representatives urged plaintiff to make deliveries prior to the dates provided in the delivery schedule, and plaintiff agreed to do so. One such request of defendant is contained in the following telegram dated August 16,1950, to plaintiff:
FROM ENG PB-A-B10-826. IT IS REQUESTED THAT EIGHTY SETS OF ITEM NUMBER FIVE, REQUISITION NUMBER EO-330-50, PURCHASE ORDER 88-B17801-96 BE SHIPPED BY OCTOBER FIRST IF POSSIBLE. THE NEED IS URGENT. REPLY IMMEDIATELY.
34. Id. Defendant’s inter-office communication dated September 23, 1950, referred to “an urgent demand for early delivery.” The communication reads as follows:
1. The findings and recommendations of a representative of this office are presented herewith in the attached copy of a report for your necessary consideration and action. The representative visited the contractor’s plant on 30 August 1950 in company with and at the request of the Contracting Officer’s Representative to provide such technical assistance as was necessary on the subject item.
2. The circumstances under which the subject kit is being procured and manufactured are both unusual and difficult. For example, this is the first time procurement of a military item which has not been previously commercially manufactured, an urgent demand for early delivery is involved and the molds to be developed in producing the item are to become the property of the Government and to serve as the basis of future *518 procurement requirements. In view of these factors, it is necessary that every effort be made to assist the contractor and to utilize the experience of the available specialist in this office in order to facilitate the manufacture and delivery of the required equipment in accordance with military requirements.
8. It is desired, in connection with the above that:
(a) The findings and recommendations in the attached report be given prompt consideration and be complied with insofar as is practicable and possible to achieve.
(b) The services of the specialists available in this office be utilized whenever necessary to provide technical assistance and guidance to the Contracting Officer and his designated representative in order that the problems involved in producing the required item may be expeditiously solved. When a specialist’s assistance is required, it is necessary that this office, Atten: ENGPA, be given a three day advance notice.
4. Since it is understood that the contractor is awaiting decisions on some of the problems discussed during the representative’s visit, it is important that early ■action be taken to avoid further delays in production processes.
35. Meeting of September 29, 1950. On September 29, 1950, a meeting was held in Chicago by the Chicago Procurement Office for the purpose of discussing the terrain map contract. At this meeting the Corps rejected the preproduction base and hilltop sections prepared by plaintiff, but did not state what type of surface texture it desired plaintiff to produce. Therefore, plaintiff was not able to proceed with the preparation of the surface texture for the terrain base sections.
36. Id. Defendant’s Exhibit 38, a record prepared by Mr. Smith, the Assistant Chief of the Supply and Procurement Division of the Pittsburgh District of the Corps of Engineers, of the meeting of September 29, 1950, does not state that the Government had reached any decision on the type of surface texture desired and does not direct the plaintiff to provide any particular type of texture. In addition, Defendant’s Exhibit 37, also a record of the meeting prepared by the Government, contains the following significant language:
*519 5. Molds. — Tbe question of suitability of certain map molds was brought up and discussed. The problem is explained fully in “Report of OCE Representative’s Visit to Pittsburgh Procurement Office and Contractor’s Plant 30 August 1950”, paragraph 3b. (Inclosure to OCE letter dated 23 September 1950, File ENGPA 400.138, subject: Terrain Model Kit, Training Aid, P.O. 88-B-17801-96.)
The discussion developed that 13 base section molds and 48 hill top molds have been completed by the contractor. Mr. Spooner examined the molds during a visit to the contractor’s plant. He informed the contractor that the molds were unsatisfactory because the molds would finish the base sections and bill top sections with an unsuitable texture. The texture would be too rough and varied, which would make marking with paint, writing with chalk or cleaning of the surface very difficult. The problem was discussed in detail to clarify the issue. Then the issue was summarized as follows:
The degree of texture was never clearly defined. At the time of negotiations a sample of hill section was shown to Mr. Stetter. The sample was too smooth in texture — Mr. Stetter was so advised. He stated he could give the Corps of Engineers any desired degree of roughness.
Mr. Stetter later acquired a sample hilltop section. The molds were prepared in accordance with the sample and certain verbal instructions. Mr. Egerter could not recall the source of the sample or the instructions. Mr. Spooner during his visit informed the contractor that the texture of the molds (13 base sections and 48 hill top sections) was unsatisfactory. Acordingly, work on the molds was stopped pending determination of the exact texture wanted. The completed molds cannot be reworked — they must be scrapped.
Mr. Egerter, representing plaintiff, also made minutes of this meeting. They read in part as follows: •
Mr. Brenden, at this time, said we should discuss the most important part of the meeting and it was the Surface of the Terrain and Hill Sections. The legal ad-visor, at this time, recalled a meeting with Mr. Stetter, Mr. Apple and himself (I feel definite about Col. Dodson, too) and at this meeting the surface of the terrain and hill sections were discussed as to the surface required and it was his opinion that they had two (2) hill sec *520 tions; one, being too smooth * * * the other having rough sections which were desirable and there was some question in his mind whether Mr. Stetter was capable of reproducing the roughness that they desired. We stated that we had reproduced the roughness desired and now it is undesirable. He said he had no doubt that we could produce the roughness but not by the methods discussed. Mr. Brenden asked if we had any idea as to the cost involved in changing the surface. We said that we had grouped our cost sheets on all rubber mold sections and this would give us an accurate cost as to what had been spent up to date * * * as to the amount of money involved we were unable to give an exact figure.
Since no decision was made by the Government at this meeting the Contractor could not begin production of the base and hilltop sections.
37. Inspection of October 9, 1950. On October 9, 1950, Mr. Spooner of the Army Map Service visited plaintiff’s plant in Pittsburgh. On this occasion Mr. Spooner observed plaintiff’s personnel stippling samples to achieve a surface texture. However, the Government did not approve the stippling method employed by plaintiff. Mr. Spooner testified that plaintiff had achieved an acceptable surface texture on the hilltop sections, but he did not say that he approved the texture nor did he say that plaintiff was advised that the new surface texture was acceptable. Mr. Spooner did not submit a report on the meeting nor did he confirm any decisions which he may have reached. At this meeting it was decided that a rubber map properly painted would be sent to plaintiff as a paint guide.
38. Inspection of October £5,1950. On October 25, 1950, Mr. Spooner and his associates returned to plaintiff’s office and again observed the work on clay molds of the base section. Present for the plaintiff were Mr. Egerter and Mrs. Stetter. On this second visit Mr. Spooner observed “four master base sections textured in a uniform manner,” and before leaving dictated Plaintiff’s Exhibit 32, which is a memorandum of the items resolved on his visit. On this date it was determined that a stippled texture like that of Defendant’s Exhibit 53 was desired. It is obvious from the memorandum that no firm decisions had been made as a result of the October 9th meeting for Mr. Spooney required that the *521 hilltop sections be redone to conform to the base section texture.
39. Inspection of October 30 and 31,1950. As a followup to Mr. Spooner’s inspection of October 25, Mr. Everhart and Mr. Smith of the Pittsburgh Office of the Corps of Engineers made a final check of the clay molds of the four terrain base sections in positive form on October 30 and 31, 1950.
40. Formal disapproval of plaintiff's first preproduction models. On October 31, 1950, defendant for the first time formally disapproved plaintiff’s preproduction molds for the base and hilltop sections which had been inspected on August 30 and September 5 and 6. The letter of October 31, 1950 reads as follows:
Confirming decision reached at a conference held in this office on 29 September 1950 at which representatives of your firm were present relative to the texture required for the base and hilltop sections of the Universal Terrain Boards required to be furnished by your concern under Contract DA-11-184-ENG-3021 (Purchase Order No. 88-B-17801-96), this is to formally advise that the thirteen base section molds and the forty-eight hilltop section molds as submitted by your concern for approval are not acceptable. These molds are not acceptable and are not approved for the reason that they will produce base and hilltop sections of an improper texture. It is therefore requested that these molds either be corrected or new molds secured which will produce the proper texture for the base and hilltop sections required to be furnished under this contract.
41. Letter of November 3,1950. By letter dated November 3,1950, plaintiff acknowledged defendant’s letter of October 31,1950, as follows:
Reference your letter of 31 October regarding the base and hilltop sections of the Universal Terrain Board to be furnished on contract DA-11-184-ENG-3021, Purchase Order No. 88-17801-96.
At a meeting in Chicago on September 29th, attended by representatives of the Chicago Procurement and representatives' of the Map Section, Army Engineers from Washington, the subject of surface finish was discussed and as per oral instructions issued at that time, and according to instructions outlined in the above mentioned letter, we are proceeding to revise molds to *522 conform to the surface which, we have been advised will be required. _ '
_ However, as the first set of molds which we had fabricated were made to specifications as outlined and according to the surface of samples submitted, we expect that the additional cost necessary to revise the mold set up will be covered by an additional order and contract.
At such time as the cost for this extra work is determined, we will advise your office in order that the proper documents may be executed to cover these costs.
42. Revision of ¶reproduction molds. After the meeting of October 25th, plaintiff stippled its models pursuant to the directions of Mr. Spooner and recalled the patterns from the foundry to change the surface texture by stippling, producing a relatively smooth texture. This took approximately one week. The mold was then sent to the foundry where aluminum castings were prepared. The castings were sent to Toyad and were used by Toyad in preparing a preproduction rubber map.
43. Delay December 1950-3anuary 1951. In December 1950, plaintiff notified defendant that the new molds and sections were ready for inspection.
(a) On December 18, 1950, plaintiff wrote a letter to Mr. Smith, Army Inspector, advising that plaintiff was still waiting for inspection of the new texture, as well as information as to desired colors. This letter reads as follows:
Confirming telephone conversation, we understand that we cannot have a Washington Inspector inspect the maps for texture and marriage until we can also have them inspected for proper painting.
On October 9th, it was decided that a rubber map, properly painted, would be furnished us which we would follow for shade distribution of color.
We now understand that this map cannot be shipped to us until approximately December 18th. You can appreciate that we cannot go ahead with the duplicate molds until the texture and marriage has been officially passed. Therefore, there will be a delay in going ahead with the duplicate molds until this inspection is made. We will expect whatever this additional time may be, added to our contractural delivery date, if necessary, although we will still use every effort to meet the original delivery date.
*523 (b) By letter dated January 2,1951, tbe Army Map Service advised that it was shipping fonr rubber terrain sections to plaintiff as color guides for the terrain model kit contract.
(c) On January 18,1951, at a meeting in plaintiff’s plant in Pittsburgh, the new molds and surface texture were informally approved.
44. Bequest for equitable adjustment. As a result of the aforesaid change in the surface texture of the base and hilltop sections, plaintiff contends that it incurred increased cost in revising and producing changed molds, for which plaintiff became entitled to an equitable adjustment in the contract price pursuant to Article 2 of the contract. Plaintiff requested an equitable adjustment in the amount of $6,117.07 by letter dated January 19, 1951, which reads in part as follows:
As per information developed in various meetings and discussions, it is requested that a supplementary contract be issued to order for the Terrain Model Kit Training Aid, P.O. 88-B-17801-96, to this company for the following changes and the additional amounts as outlined.
‡ Hí # H*
3. The sample as originally furnished for the surface texture of the Terrain Maps and the Hill Top Sections showed a rough, pebbly type texture. One complete set of molds was processed and after the product of these molds had been examined, it was discovered that it was impossible to use the Boiler Markers on a texture of this type. As a result of this decision, instructions were issued to change the type of the texture on the surface of these parts which necessitated re-making of the model and the processing of the patterns to produce the aluminum molds. The total cost which had accrued to produce the first set of molds before the request was made for change was $6,117.07.
# # * * *
It is respectfully requested that the above changes be covered fully by a supplementary contract or contracts at your earliest convenience.
45. Formal approval of models. Formal approval of the molds took place on February 19, 1951, a month after the inspection, when defendant wrote plaintiff in part as follows:
Beference is made to subject order and to meeting in your office 18 January, 1951, which was attended by *524 representatives of the office, Chief of Engineers, Chicago •Procurement Office and the Pittsburgh Inspection Office.
The .following recommendations agreed upon at cited conference are approved by this office.
(á) Acceptance of surface texture of base and hilltop sections, as per marked samples furnished by you.
(b) Acceptance of color of base and hilltop sections, as per marked samples furnished by you.
*****
It is requested this office be furnished as soon as possible a cost breakdown covering items under paragraphs three, four and five. This inf ormation' is required in order that a modification to the order may be prepared.
46. ToyacPs rubber claim. On April 20,1951, Toyad Corporation made claim upon plaintiff as follows:
The object of this letter is to call to your attention á condition of grave import to our Company and which will result in a serious set-back that undoubtedly will take a long time to overcome unless some corrective measure is taken.
During the spring of 1950 when we were asked to bid on the above referred to contract, we were purchasing natural latex at a price of 300 per pound and G.R.S. latex at a price of 27.50 per pound. We estimated it would take approximately 47 pounds of compound natural and G.R.S. latices to make one set of map sections. In anticipation of a price increase, we figured the natural latex at 340 per d.w. pound and the G.R.S. latex at 27.50 per d.w. pound. On the basis of using 80% natural and 20% G.R.S. our average compounded price was 32.70 per pound for the 47 pounds or a total of $15.36 for the total natural and G.R.S. to make one set of maps. This is tire price we used for the required raw material in making our- quotation to the Gardner Displays Company on May 10,1950.
Owing to circumstances beyond our control, we now find that the raw material cost per set of maps has increased from the aforementioned $15.36 to $34.78 or a difference of $19.42 in raw material alone on one set of maps. This increase is caused by the fact that we now pay 840 per d.w. pound for natural latex and 340 per a.w. pound for G.R.S. latex, which on the same 80% natural and 20% G.R.S. basis, gives us an average compound price of 740 per d.w. pound.
Since there are more than 3600 sets of these maps to be furnished on this order, you can readily see that we *525 are faced with a tremendous loss if we are to be held to our original quotation. Simple arithmetic indicates it will take approximately 170,000 pounds of compounded latices to complete this job and unless we get price adjustment for the unpredictable tremendous price increases in the raw material required, the completion of this project will be very costly.
We are presenting these facts to you in the hope that this matter can be taken up with the proper authorities with the object of making a justifiable adjustment. _
_ Will you please let me know what we may expect in this regard ?
Plaintiff submitted Toyad’s claim to the defendant for attention on April 24,1951.
47. July 1951 conference. On July 26, 1951, pursuant to a request from plaintiff a meeting was held in the Chicago Procurement Office wherein the following facts were agreed to by the parties:
At the time of the award of this contract to Appellant and at all times subsequent thereto up to the time the change in surface texture was ordered made, all conversation had with Appellant relating to' the surface texture that was required for the base and hilltop section indicated a rough pebbly texture. Further, shortly after the award of this contract Appellant was furnished a rubber casting similar to that as shown in Exhibit S as a guide for the texture required. Using this rubber casting as a guide and from prior conversations had with interested Government personnel as to the type of texture required, Appellant fabricated the molds. Upon inspection of the base and hilltop sections produced from these molds it was discovered that due to their pebbly surface texture they could not be properly marked with the paint dispenser heads with the required railroad track and road and runway marker. As a result of this, Appellant was required to rework the molds so as to produce therefrom base and hilltop sections consisting of a relatively smooth or stippled texture.
48. Denial by contracting officer. On July 2, 1952, the contracting officer denied plaintiff’s claim for the increase in contract price and plaintiff filed a timely appeal.
49. Proposed Change Order 5. On or about October 15, 1952, defendant issued to plaintiff a proposed Change Order No. 5, dated June 30,1952, in the amount of $5,505.51, as an *526 equitable ad j ustment for the cost of changing the molds. The change order reads as follows:
Eeference is made to General Povision 2 entitled “Changes” of the above numbered contract dated 26 June 1950 and modifications numbered 1 through 4 thereto.
It has been determined that due to the change in the surface texture requirement for the base and hilltop sections of the. Terrain Model Kit, Training Aid from a rough and pebbly texture as originally specified and required to a relatively smooth texture such as will permit railroad track and road and runway markings being placed thereon it is necessary and to the best interests of the Government to modify the contract in certain particulars as follows:
The surface texture of the base and hilltop sections of the Terrain Model Kit Training Aid. shall be of that degree of roughness which will permit the application thereon, with the dispenser head, of railroad track and road and runway markings.
As a result of the foregoing change the Lot Price for Item 5a under Requisition No. EO-330-50 is changed from $19,747.00 to $25,252.51, an increase of $5,505.51, and the total contract price is changed from $688,530.19 to $694,035.70.
All other terms and conditions of said contract as it heretofore may have been modified shall be and remain the same.
Therefore, if the foregoing modification of said contract is satisfactory, please note your acceptance thereof in the space provided below retaining one copy and returning three executed copies to the Chicago Procurement Office, Corps of Engineers, U.S. Army, 226 W. Jackson Boulevard, Chicago 6, Illinois.
50. Rejection of Change Order 5. Plaintiff, by letter dated November 5,1952, rejected Change Order No. 5. The letter reads as follows:
This will acknowledge receipt on October 16, 1952, of proposed Change Order No. 5 to the above referenced contract.
We have previously appealed to the Secretary of the Army from your decision 'allowing us a contract price increase in the amount of only $5,505.51 for this change, as such amount does not allow us the equitable adjustment in contract price to which we are entitled under Article 2 of the contract. Accordingly, we respectfully *527 decline to accept the contract price increase provided in Change Order No. 5 and assert our claim for a contract price increase in the amount of $87,446.31 to equitably compensate us for the change. For grounds for declining the contract price increase provided in Change Order No. 5, and for our claim for a contract price increase in the amount of $87,446.31, we refer you to our Appeal to the Secretary of the Army, dated August 28, 1952, which is incorporated herein by reference.
It will be noted that our appeal from the Contracting Officer’s decision claims $81,940.80. This amount was claimed on the assumption that under the decision of the Contracting Officer, the sum of $5,505.51 would be paid specifically for the cost of redesigning and fabricating the new molds. In view of the fact that Change Order No. 5 is of such scope that it is the basis for our entire claim for equitable adjustment, we are claiming herein the entire amount, namely $87,446.31.
51» A8BGA decision. On June 11,1954, the Armed Services Board of Contract Appeals in ASBCA No. 1598 denied plaintiff’s appeal on its claim for an equitable adjustment in contract price in excess of the amount allowed by the contracting officer.
(52. Acceptance of Change Order 5. On October 15,1954, defendant issued a new change order with substantially the same provisions as the previous change order dated June 30, 1952. The new change order was accepted by plaintiff, with the following exception and reservation:
Our acceptance of the foregoing modification is conditioned upon the understanding that it shall not be construed as constituting a waiver, release, settlement, or relinquishment of, and is without prejudice to, our claim for damages and/or for an equitable increase in the contract price to compensate us for increased costs other than the increased costs covered by the foregoing modification (which other increased co'sts and facts concerning our claim therefor were described in our Appeal in ASBCA 1598), or our right to prosecute such claim in the United States Court of Claims or elsewhere.
Damages
53. Bid estimate. At the time Toyad submitted its bid to plaintiff, and plaintiff submitted its bid to defendant, Toyad was paying 26.5 cents per pound for natural latex and 27.5 *528 cents per pound for GRS latex. Nevertheless, Toyad’s bid to plaintiff, and consequently plaintiff’s bid to defendant, was figured on a price of 84 cents per pound, allowing seven and a half cents as a contingency for any price rise that could reasonably be anticipated with respect to the natural latex to be used in the performance of the contract. Plaintiff and Toyad reasonably contemplated and expected that production of the rubber components of kits would be completed within seven or eight months after award of the contract using latex coating an average of not more than 34 cents per pound.
54. Id. Toyad’s bid was prepared by Mr. Moran, the Controller of the Company, who had had considerable experience in purchasing rubber for Toyad. The estimated material cost of the performance of Toyad’s contract was as follows:
Prices were estimated as follows:
37.6 lbs — Natural Latex Compound at .34-$12.78
9.4 lbs — G.R.S. Latex 'at .275_ 2. 58
15.36
Contract calls for 3600 sets:
Cost’of Natural Latex — 3600X12.78 (1)_$46,008.00
Cost of G.R.S. Latex — 3600 X 2.58 (2)_ 9,288.00
55,296.00
20% Handling Charge (3)_ 11,059.20
.Estimated Total Material Including Handling_ 66, 355.20
(1) The cost of the natural latex is based on the use in each map set of 87.6 pounds of natural latex at 34 cents per pound which amounts to $12.78. Since there were 3,600 sets finally furnished, the estimated material cost would be $12.78 X 3,600 or $46,008.
(2) The cost of the G.R.S. latex is ba'sed on the use in each map set of 9.4 pounds of G.R.S. latex at 27.5 cents per pound which amounts to $2.58. Since there were 3,600 sets finally furnished, the estimated material cost would be $2.58 X 3,600 or $9,288.
(3) The 20 percent handling charge was included in the bid to cover a loss of material actually experienced by Toyad *529 in the handling of material. The loss occurs in transferring the latex from the tank car on the railroad siding to storage tanks and from compounding tanks back to storage tanks, from the storage tanks to the production line. In each of the above steps there is some slight loss. It is based on Toyad’s actual experience over a number of years in handling liquid latex. The charge does not include any amounts for labor used in the handling. It is solely the actual loss of material.
(4) Liquid latex is perishable and requires controlled storage conditions. Under proper conditions it can be stored for about four months without spoilage risk.
55. Rubber compound change. The bid was based on using a compound of 80 percent natural latex and 20 percent synthetic latex. On this basis it would have taken 135,000 pounds of natural latex and 84,000 pounds of synthetic latex to perform Toyad’s contract, or a total of 169,000 pounds. Due to the rise in prices it was decided that it would be more economical to use more synthetic latex since it was cheaper, thus a new compound was developed using 30 percent synthetic and 10 percent natural.
56. Initial purchase of latex requirements. Immediately after Toyad learned that plaintiff was low, it ordered from Xylos Rubber Company five 10,000-gallon tank cars of loxite (liquid latex) on its purchase order 1945, dated June 5,1950, in anticipation of its natural latex requirements. The placing of an order in advance of actual need was normal practice for Toyad. The invoice price was 37 cents per pound. Even though purchase order 1945 did not insure Toyad against a rise in price, it did insure the availability of latex. In addition, Toyad had a high Government priority for latex on this contract.
(a) All that was required to obtain delivery was notification to Xylos. Normally delivery could be expected within two or three weeks after notification. However, after the outbreak of the Korean war, natural latex could be obtained on 80 days’ notice.
(b) The 50,000 gallons converted to dry weight pounds equaled 243,500 dry weight pounds which was more than adequate to meet the requirements of this contract.
*530 (c) Because of the delay resulting from the actions of the Government, Toyad was able to use only a very small amount of the natural latex under purchase order 1945, dated June 5,1950.
57. Latex storage capacity. In July of 1950 the total tank storage capacity of Toyad was 38,753 gallons. This was increased in January 1951 to 40,753 by the addition of one 2,000-gallons compounding tank. With some variation, a gañón of liquid latex is equivalent to 4.87 dry weight pounds. On this basis the storage capacity as of July 1950 was 198,467.11 dry weight pounds which was more than adequate to meet the needs of this contract. The storage facilities were verified by a special agent from the F.B.I.
58. Latex purchases 1950-1951. Toyad’s actual purchases of natural latex for. 1950 and 1951 through Xylos Bubber Company, a Division of Firestone, were as follows:

1950

January _$0.245
March_ 0.255
April- 0.265
June _ 0.315
August 1- 0. 37
August 14- 0.46125
August 18- 0.46125
August 23_ 0.46125
September 19- 0.39
September 25- 0. 39
September 29- 0. 39
October 10- 0. 59
November 8- 0. 60
November 15_ 0.60

1951

January 2_$0. 60
February 10_ 0.60
February 21_ 0. 6525
February 19_ 0.6525
February 28_ 0.6525
March 21_ 0.60
March 21_ 0.60
March' 23_ 0.60
April 5_ 0.60
April 30_ 0.845
April 30_ 0.845
May 23_ 0.845
June 18_ 0. 845
June 26_ 0. 845
July 27_ 0.845
July 31_ 0.845
(59. G.B.8. purchases 1950-1951. Toyad’s actual purchases of G.B.8. (synthetic) latex for 1950 and 1951 were as follows:
September 1, 1950_$0.2705
September 19, 1950- 0.2705
October 6, I960-_ 0.2705
November 10,1950- 0.2705
November 30,1950_ 0.2705
December 12, 1950_$0.2705
March 5, 1951_ 0. 34
April 18, 1951_ 0.31
May 23,1951_ 0.31
July 14,1951_ 0.31
60. Latex in storage. The natural latex raw material inventory (in gallons) for the pertinent period of this contract was as follows:

*531

61. Description of mold production cycle. The total time required for the preparation of the molds by plaintiff and the first preproduction model by Toyad was from approximately June 10, 1950 to August 30, 1950, or a total of 80 calendar days. This was a reasonable period of time.
(a) The various stages from the drawings to a completed product used on this contract were as follows:
(1) From the drawings a clay model of each of the four base sections was prepared. The proper contours are shaped in the clay and the four models are matched to make sure that all the edges match. All sides of the model must match with all the sides of the other models. This phase of the work consumes approximately 85 percent of the total time involved in the preparation of the molds.
(2) The next step is to make a plaster waste mold (a negative) of the clay models in order to reproduce the clay model into a plaster model (a positive) which then has the same appearance as the original clay model. The purpose in preparing the plaster model is to have a working model which cannot be distorted if it is bumped or gouged. Then the waste mold is broken away from the plaster model.
(3) After a check of the matching of the four plaster models, the surface texture is applied. To achieve the surface texture, a shellac is added to the smooth model and then mastic is added. After the mastic, which is a glue, the aggregate (groundup latex and sawdust combination), is added to achieve a surface texture. In this case, plaintiff used as a pattern for the size of aggregate that which was brought back from the Army Map Service.
(4) The next phase of the operation is to take the model with the surface texture applied and make a final plaster pattern which goes to the foundry where aluminum castings are prepared as production molds.
*532 (5) The aluminum castings were then sent to Toyad and were used to produce the rubber map sections.
(b) After the defendant had informally decided upon the change from a rough and pebbly surface with the use of aggregate to a smooth surface by stippling at the meeting of October 25, it took six days to prepare four base sections in foam rubber which were inspected on October 30 and 31. (See findings 39 and 40.) By December another complete preproduction test model was ready for inspection. (See finding 43.) Aluminum molds for the production line would have been ready three to four weeks later.
62. Production pouring time to completion. The total time from the beginning of Toyad’s work, after written approval of the new surface texture by the Government, to the completion of its contract was from February 20, 1951, to July 31,1951, ora total of 162 calendar days. On February 20, 1951, the day after Government approval, Toyad began production of the trees and accessory items and completed all trees and accessory items by June 15, thus the total production time for trees and accessory items was 116 days. On March 19, the production line for maps had been set up and production on the maps continued until July 31, or a total of 135 days. During the period of actual production on the maps, the production plant was closed from July 1 through July 8, a period of eight days, for an annual vacation period. The total actual production time amounted to 127 days for the maps.
,63. Rubber consumption im, actual performance. Actual experience on the contract revealed that Toyad used 133,194 pounds of natural latex and 56,124.7 pounds of synthetic for a total of 189,000 pounds. Thus the difference between estimated (135,000 natural and 34,000 synthetic or a total of 169,000 pounds) and actual amounted to 20,000 pounds or 10 percent more than the estimated quantities. The quantity of G.R.S. used was increased because of the larger percentage used in the compound, 30. percent rather than 10 percent. A 10 percent overrun is a reasonable and customary figure and corresponds with Toyad’s experience.
(a) A summary of the natural latex actually used from February 1951 to July 31,1951, is as follows:

*533

These figures were verified by Government audit and there is no dispute as to the amounts and quantities.
(b) A summary of the G.R.S. material used from February 1951 to July 31,1951, is as follows:

These figures were verified by Government audit and there is no dispute as to the amounts and quantities.
(c) Thus the actual cost of the materials used in the performance of Toyad’s contract was as follows:
A. Cost of Natural Latex___$100,476. 00
B. Cost of G-.R.S. Latex- 19,421.47
119, 897.47
C.Handling 20% of materials 23,979.49
143, 876. 96
*534 64. Recapitulation of delays, August 30, 1950 to February 19, 1951.
(a) This finding is founded on the premise that Toyad would have been 'able to commence production of the maps and hilltop sections by November 1, 1950, had the Government promptly decided what it wanted in the way of surface texture and communicated such decision to the plaintiff. The significant facts are cited in the following paragraphs
(b)through (i).
(b) The first inspection by the Government was on August 30, 1950. At this inspection four base sections were inspected as has been pointed out in finding 29. The only problem that developed at this inspection was that of the surface texture and the map sections were accepted except for surface texture. Production was suspended pending a subsequent inspection.
(c) Five days later the second inspection by the Government was held on September 5 and 6, 1950, and production was stopped pending a decision from the Government on what surface texture it desired (finding 30).
(d) Twenty-three days later on September 29, 1950, the Government had a meeting with the plaintiff, but no definite decision was made concerning surface texture and plaintiff was thus unable to proceed with production (findings 35 and 36).
(e) Ten days later on October 9, 1950, Mr. Spooner met with the plaintiff in an effort to achieve a new surface texture. However, plaintiff was not able to proceed with production for no approval of surface texture was issued (see finding 37). At this meeting it was decided that defendant would send plaintiff a rubber map properly painted for use as a paint guide.
(f) Fifteen days later, on October 25,1950, Mr. Spooner met with the plaintiff 'and observed stippling to achieve a surface texture on the base sections (finding 38). After this meeting plaintiff began preparation of new molds and Toyad made rubber castings (finding 42).
(g) By December plaintiff had another preproduction model ready for inspection, however, this time the Government asked that it be painted prior to inspection (finding 43).
*535 (b) Samples of the paint colors requested in October 1950 were sent to plaintiff on January 2,1951, and it was not until January 18, 1951, that the Government finally inspected the new preproduction model (finding 43).
(i) On February 19,1951, the Government issued a formal approval of the surface texture, and plaintiff was free for the first time to begin mass production of the training aids (finding 45).
65. 0ommencement of production run. On February 19, 1951, Toyad received notice that the molds had been formally approved and was directed to commence production under the contract. The following day, February 20,1951, Toyad began its production. By this time the price of natural latex had risen to 84.5 cents per pound.
66. Delay total. Thus the suspension and interruption of production resulting from unreasonable delay in the change of surface texture was from August 30, 1950, to February 18,1951, or a total of 171 days.
67. Blame. Since the Government inspected the prepro-duction tit on August 30 and 'again on September 5 and 6, 1950, and since the evidence establishes that the Government wanted a smooth surface like that of Defendant’s Exhibit 46, the Government could have promptly made its decision known to plaintiff rather than to wait until February 19, 1951, to render a formal approval of the surface texture.
68. “But for” production readiness. A two-week period from August 30,1950, was a reasonable period within which to make a decision regarding surface texture. An additional two weeks was reasonable for plaintiff to change the surface texture and have a preproduction model ready for inspection. To change the surface texture, plaintiff recalled the plaster patterns from the casting factory, washed off the surface, stippled a new surface and sent the pattern back to the foundry. This entire operation took approximately one week. The change was a fraction of the time required to shape the original clay mold. New aluminum castings were prepared and sent to Toyad for preparation of the rubber map. Since the inspection would concern only the surface texture, this could have been done in one day’s time. In fact, at no time did the Government spend more than two days on *536 an inspection. Aluminum molds for production would have been ready in October. On tbis basis the plaintiff and Toyad could have started production in November 1950.
(69. Extra latex costs. The extra costs attributable to the unreasonable delay are as follows:
A.Natural Latex:
133,194 lbs. (amount actually used) at following prices:1
37,147 lbs. at .39_$14, 487. 33
52,795 lbs. at .59_ 31, 149. 05
43,252 lbs. at .60_ 25, 951. 20
133,194 lbs. Total_$71,587.58
B.G.R.S. Latex:
56,124 lbs. at .2705_ 15, 181. 54
86, 769.12
C.20 % handling_ 17,353.82
Total_ 104,122.94
i Derived from Inventory on November 1, 1950, and invoice prices on material purchased efore and after October 31,1950, as follows:

Inventory Price Computation (80,9/f2 lbs. on November Í, 1960)

Invoice #15839 — 9/19/50..:.. 2,067 lbs. '
Invoice #15836 — 9/25/50..__ 17,700 lbs.
Invoice #15837 — 9/29/50.. 17,374 lbs.
37,147 lbs. at .39..$14,487.33 37,147 lbs.
Invoice #16486 — 10/10/50. 17,684 lbs.
Invoice #16487 — 10/10/50. 17,409 lbs.
Invoice #16488 — 10/10/50.. 17,702 lbs.
52,795 lbs. at .59_ 81,149.05 52,795 lbs.

Plus

Invoice #17562 — 11/ 8/50. 17,523 lbs.
invoice #17564 — 11/16/50. 17,748 lbs.
Invoice #17563 — 11/16/50.. 7,981 lbs.
43,252 lbs. at .60.... 25,951.20 43,252 lbs.
Total. 71,587.58 133,194 lbs.
70. Net damages. By subtracting $104,122.94, the cost of material if there had been no delay, from $143,876.94, the actual cost of performance, it is found that the balance amounts to $39,754.02 which is the extra cost of material directly, attributable to the unreasonable delay.
Conclusion op Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of *537 law that plaintiff is entitled to recover of and from the United States and judgment is therefore entered for plaintiff in the amount of thirty-nine thousand, seven hundred fifty-four dollars and two cents ($89,754.02).

 There was no objection to He novo evidence at the trial in the court and both parties introduced considerable do novo evidence. The court can therefore consider all the evidence including that produced de novo. Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 861 (1963), and later decisions to the same effect.

 In fact, neither this issue nor any others of a legal nature discussed in this opinion were raised by the defendant in its brief to the commissioner, who concluded that they needed consideration nevertheless.

 The written report made of the August 30 inspection was lost and not available as an exhibit.