Davis, Judge,
delivered the opinion of the court:
In C.J. Langenfelder & Son, Inc. v. United States, 169 Ct. Cl. 465, 341 F. 2d 600 (1965), we held that plaintiff was entitled to recover additional compensation, at six dollars per cubic yard, for unsuitable soil removed from pipe trenches dug under a contract for grading, drainage, and paving work at the Dulles Airport, including not only such material taken from below the excavation depths shown on the drawings but also within those limits. The case was remanded to the trial commissioner to determine the amount of recovery under Rule 47(c).[1] The trial commissioner has now found that plaintiff removed 25,337 cubic yards of unsuitable soil from the trenches, amounting, at $6 a cubic yard, to $152,022. Plaintiff wholly accepts this finding. Defendant does not dispute the figures as such, but raises several legal defenses which it says would eliminate or reduce the recovery.
*410 1. The Government first argues that the contractor should have done much more to use the excavated unsuitable soil as backfill even though it might have been more convenient to employ other materials as plaintiff did. The point sought to be made is that the contractor did not do all that it reasonably could to utilize the shale and other unsuitable material found in the trenches.[2] The answer is that the trial commissioner properly found (findings 4(b) and 4(c)) that the Langenfelder company employed “standard and acceptable construction practices” in drilling, and that in the circumstances it would have been “impracticable”, “expensive”, and “uneconomical” to use other means which would have enabled the unsuitable material to be made suitable. These findings are adequately supported,[3] and the legal standard embodied in them is the appropriate one. Where the contract expressly indicates that unsuitable material is not to be used for backfill, a contractor is certainly not held to a duty to “mitigate damages” or to “cooperate with the Government”—as defendant puts it—by taking impractical and uneconomic steps to turn concededly unsuitable soil into useful material. Such a standard would be unreasonably burdensome and unanticipated. No contractor reading the agreement in advance would suppose that he would be required to use such impractical and uneconomic measures.
2. Another defense is that plaintiff did not notify the defendant of the claim for removal of unsuitable material, or keep records of the amounts involved, or arrange for the Government to keep such records. This is a point which could and should have been made when the case was earlier before us. All the facts on which defendant relies were known at that time, and the defense, if valid, would have averted a trial on damages (and made unnecessary any ruling on the merits of the issue of liability under the contract). Because of this belatedness, we shall not set forth in detail our reasons (in addition to the untimeliness) for rejecting *411 the argument. Suffice it to say that the Government was properly notified and that in the circumstances records of actual excavation are not a prerequisite to recovery; calculation on the basis of the paylines (as was done here) is an acceptable substitute.
3. The third of the Government’s points is that plaintiff should not be allowed the full contract figure of $6.00 for each cubic yard of unsuitable material removed but only that sum less the component of the “contract unit price” (which has already been paid) representing payment for excavation and removal.[4] In other words, defendant insists that the $6.00 figure is a substitute for the normal excavation cost, not an addition to it. Although our opinion on liability does not delve into this question, it assumes that the $6.00 price is additional, rather than alternative.[5] The Administrator of the Federal Aviation Agency, when he first held for plaintiff on liability, also seems to have proceeded on the same assumption.
This is the reading which best fits the contractual terms and purpose. The various “contract unit prices” for pipe (Item 102-5.1) did not cover excavation alone; they were over-all figures “per linear foot”, constituting “full compensation” for a large number of components, including “furnishing, hauling, and installing the pipes; for excavation; for bedding; backfill and compaction; for jointing; for connections to drainage structures; for cleanup and for all material, labor, equipment, tools, and incidentals necessary to complete the drain as shown on the plans * * *.” The all-inclusive nature of these unit prices has a twofold significance. First, since there is no breakdown for excavation alone, *412 it would seem that the contract did not look toward adjustment of the price for excavation of unsuitable material (which is specifically given in a flat sum) by some unspecified figure for excavating suitable soil. Second, it is natural to assume that the over-all “contract unit price”— covering the Avhole process of furnishing and installing the pipe—contemplated soil suitable for backfill, especially since the contract makes special provision for paying for unsuitable material. This separate clause covers nothing but removal of unsuitable soil and indicates that compensation is to be $6.00 “per cubic yard”, without qualification or diminution. This flat $6.00 payment seems intended as extra compensation for the additional expense of working with unacceptable substances, which are harder to remove and cannot be used for backfill. If the Government wished to subtract from the $6.00 figure the “normal” cost of removing ordinary material, it should have been much more explicit. Cf. WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 6-7, 10, 323 F. 2d 874, 876-77, 879 (1963).
4. Finally, defendant urges that plaintiff should be paid for removing unsuitable material only to the extent that suitable soil was needed to replace it as backfill. Because of the space taken by the pipe laid in the trenches there was necessarily less backfill than the material originally excavated. But the clause on unsuitable soil says unequivocally that “the cost of removing unsuitable soil shall be paid for at the unit price for unclassified Excavation for Structures under Item 752-5.1 [i.e., $6.00 per cubic yard].” There is no restriction to unsuitable soil which is replaced by suitable backfill; on the contrary, the clause goes on to say that the $6.00 price “will include all required replacement with approved materials as specified * * *” (emphasis added), thus suggesting that in some circumstances there would be no replacement. Moreover, because the cost of removing unsuitable material was higher, even without the necessity for supplying backfill, the contractor would have to be compensated for that more onerous task. The $6.00 figure was apparently chosen to cover both the higher cost of removal and the back-fill expense where replacement was required. We do not see the bearing of the sentence (on which the Government leans) *413 saying that “Excavated material not required or acceptable for backfill shall be disposed of by the contractor as directed by the Government.” There is no suggestion in that simple directive as to disposal that any of the costs of removing unacceptable material were to be left uncompensated.
In sum, the Govermnent’s objections are all without merit and the plaintiff is entitled to recover $152,022. Judgment will be entered to that effect.
FINDINGS OF FACT
The court having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and arguments of counsel, makes findings of fact as follows:
1. (a) This case arises out of a contract entered into in December 1958 by plaintiff with the Federal Aviation Agency to do grading, drainage and paving work at Dulles (then called Washington) International Airport, located in Virginia.
(b) In C. J. Langenfelder & Son, Inc. v. United States, 169 Ct. Cl. 465, 341 F. 2d 600 (1965), this court granted plaintiff’s motion for summary judgment of liability and denied defendant’s motion to dismiss or to suspend proceedings. Judgment was entered to that effect, with the amount of recovery to be determined under Rule 47 (c). [1]
*414 (c) The question herein considered is, generally speaking, the amount of unstable soil which plaintiff excavated from the pipe trenches for which it is entitled under ’the specifications to premium payments.
2. (a) The invitation for bids which defendant issued on November 7, 1958, for the contract work included a solicitation of bids on a lineal foot basis for the furnishing and installing of approximately 26,000 feet of various types of subsurface pipe. The bid prices were to include the cost of excavation and backfill of the trenches in which the pipes were to be installed.
(b) The specifications provided in pertinent parts:
ExcavatioN [702-8.2] : The contractor shall excavate all materials encountered to the depth required. * * *
Excavated material not required or acceptable for backfill shall be disposed of by the contractor as directed by the government. Excavation shall not be carried below the required depth. * * *
Unstable soil shall be removed for the full width of the trench and replaced with sand or with approved granular material. The government shall determine the depth of removal of unstable soil and the amount of backfill necessary. The backfill shall be thoroughly compacted and shaped to form the bed for the pipe.
The cost of removing unsuitable soil shall be paid for at the unit price for Unclassified Excavation for Structures under 752-5.1 [$6.00 per cubic yard]. This will include all required replacement with approved materials as specified * * *.
Pipe trenches shall be excavated to the depths required for installation of the pipes at the invert elevations shown on the plan.
Any change in depth in excess of six (6) inches will be paid for under Item 752-5.1, Unclassified Excavation for Structures.
(c) At the time of the preparation of its bid, plaintiff knew “fairly well” from defendant’s test boring data the stratifica *415 tion in the work areas of overburden, soft shale and hard shale. Plaintiff knew that certain grading work which it was also to perform under the contract required excavation, haulage, placement and compaction of approximately 2,400,000 cubic yards of material at the airport.
(d) Plaintiff’s bid prices for furnishing and installing the pipe ranged from $5.83 to $35.56 per lineal foot, depending on the type and size of the pipe and the depth of the trenches in which the pipes were to be laid.
3. (a) Plaintiff subcontracted to Lloyd E. Mitchell, Inc., part of the subsurface pipe work consisting of furnishing and installing cast iron and steel utility pipes.
(b) Prior to the commencement of the subcontractor’s pipe work, defendant made changes in the size, location, depth and length of the pipes.
4. (a) The work of excavating the trenches began in the spring of 1959 and the method of operation by plaintiff and by its subcontractor was substantially the same.
(b) The material encountered in the excavations fell into three general categories: (1) overburden, (2) soft shale (generally in a thin layer atop the hard shale) and (3) hard shale. When only overburden was encountered, it was excavated and piled on one side of the trench, and after the pipe was in place, the overburden was replaced in the trench to the extent that it was needed. When shale was encountered, plaintiff or its subcontractor shot the shale with dynamite. When there was overburden in a shale area, plaintiff drilled through the overburden and shot the shale with dynamite, with the result that the shale and overburden were mixed. The mixture was then excavated. The method of drilling through the overburden, without first removing it, and shooting the shale through the overburden, was in accordance with standard and acceptable construction practices. Under the circumstances of the job, it would have been impracticable and uneconomical for the overburden to have been removed first and thereafter used as backfill or to separate the shale and overburden after the excavation of the mixture.
(c) The shale, as well as the mixture of shale and overburden, as excavated from the trenches, was not suitable for *416 backfill. Because of the shape, condition and size (ranging up to three square feet) of the shale as excavated, the mixture could not meet the compaction requirements of the specifications. It would have been necessary for both the shale and the mixture to be subjected to expensive and impracticable crushing and/or rolling operations before they could have been made suitable for backfill as prescribed by the specifications.
(d) From the beginning of the excavations, plaintiff was told several times by Government inspectors that the excavated shale and the mixture, as above described, could not be used for backfill. Plaintiff, accordingly with the concurrence of the Government, hauled tlie shale and the mixture to embankment areas and hauled in other material as back-fill from grading areas.[2]
(e) In June 1959 before the backfilling began, the subcontractor’s representative asked plaintiff’s project manager whether the shale which had been excavated could be used for backfill. Plaintiff’s proj ect manager stated that the Government inspectors had told plaintiff that the shale could not be so used, but that he would arrange a meeting in which the subcontractor’s representative could discuss the matter with the Government resident engineer. Whereupon, on June 19, 1959, plaintiff’s project engineer and the subcontractor’s representative met with the Government resident engineer who stated that the shale could not be used as back-fill. The subcontractor’s representative then stated that the shale would be replaced with material suitable for backfill, but that additional payment for the extra work would be requested. Thereafter, plaintiff rented equipment to the subcontractor to haul away the shale as it was excavated and to haul in other material as backfill from grading areas.[3]
(f) By letter of June 25, 1959, addressed to plaintiff, the subcontractor set forth the essence of what transpired at the above-mentioned meeting, requested payment for “removing unsuitable soil” at the unit price for unclassified excavation *417 for structures imder 752-5.1 of tlie specifications, 'and asked that a formal change order be issued. The question of payment “for the removal of unsuitable material” was a topic of many subsequent meetings between plaintiff and defendant, during which time other matters (changes) were also the subject of discussion. It was finally agreed by the parties that the “unsuitable soil item” would be excluded from negotiations regarding the changes, and would be considered separately. Thereafter, as detailed in the aforementioned opinion of this court, plaintiff sought unsuccessfully from defendant over the course of many months, “additional compensation of $6.00 per cubic yard for the removal and replacement” of unsuitable soil.
5. (a) In its opinion this court ruled that plaintiff was entitled to “premium payments” for all the unstable soil which it removed and replaced.
(b) Although the specifications (finding 2.(b), supra) refer to “unstable soil” and to “unsuitable soil,” the parties agreed that these terms are interchangeable.
6. At the trial there was considerable testimony concerning the nature of shale, both hard and soft, and whether shale is rock or soil, within the meaning of the specifications. It appears that shale is a clay substance which hardens under centuries of compression and becomes more in the nature of rock; but that when exposed to weathering, it can readily decompose into its original state. There was also testimony regarding what is meant by unstable or unsuitable soil. It is concluded from the entire record in the case that:
(a) the stability or suitability of the soil was to be determined on the basis of its capacity to bear the load which was to be imposed upon it;
(b) the shale and mixture of shale and overburden, as excavated from the trenches, could not bear the load which was to be imposed on the backfill; and
(c) the parties regarded the shale and the mixture of shale and overburden as unstable soil and/or unsuitable soil.
7. (a) Plaintiff kept no record of the total volume of unsuitable soil which it (or its subcontractor) removed from
*418 the trenches. Plaintiff’s claim is for $6 per cubic yard of shale and shale mixture which it or its subcontractor excavated within the pay lines as shown on the contract drawings and boring charts which reveal the location of overburden and shale. The evidence reveals that out of 35 trenches excavated by plaintiff in which shale was encountered, 19 had overburden which ranged from 7 inches to 5% feet in depth. Since there was no appreciable overburden in the trenches which were excavated by the subcontractor, plaintiff makes no claim for shale mixture excavated by the subcontractor. Plaintiff makes no claim for excavated material from trenches in which all of the material consisted of overburden.
(b) Plaintiff’s initial claimed quantities of unsuitable soil, on the formulae above indicated was made up of the following (in cubic yards) :

Mixture Shale Total

Plaintiff 3,068 12,354 15,422
Subcontractor 10,415 10,415
25, 837
During the trial plaintiff conceded that it had made an error in computation of 500 cubic yards, and therefore reduced the claimed quantities to 25,337 cubic yards. Defendant, while not admitting that plaintiff is entitled to recover and aside from the legal defenses it raises, admits the accuracy of plaintiff’s figures.
8. It is found that plaintiff is entitled to recover from defendant $6 per cubic yard for 25,337 cubic yards of unsuitable soil which it removed from the trenches, or a total sum of $152,022.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and it is therefore adjudged and ordered that it recover of and from the United States the sum of one hundred fifty-two thousand and twenty-two dollars ($152,022.00).

 This was before United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 430 n. 6 (1966), ruled that the issue of damages relating to liability “under the contract” should first be determined administratively. The parties have agreed (see finding 1(b) n. 1) to waive any right to an administrative determination and to have the question decided by court trial. Since the issue is not jurisdictional (Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 806-08, 337 F. 2d 861, 862-63 (1963)), this waiver can be and is accepted.

 In our opinion on liability we were not certain that shale and other unsuitable materials were to be treated exactly alike under the contract. It is now clear that they were all in precisely the same class for the purposes of this litigation.

 In the administrative proceedings prior to the court action, the Government counsel expressly admitted that it was not practical to act in any other way than plaintiff had proceeded.

 In our earlier opinion -we mistakenly assumed that $3.93 was the “contract unit price” for excavation. There were several “contract unit prices”, depending upon the type of work to be done, and these prices covered work other than excavation (including installation of the pipe). The figure of $3.93 appears to represent the cost of excavation included in one of these “contract unit prices.”

 We characterized plaintiff’s claim before the Federal Aviation Agency as “a request for additional compensation of $6.00 per cubic yard for all this work” and referred to "premium payments for all the unstable soil which it [plaintiff] removed and replaced”, to "extra payment for the removal and replacement of unstable soil”, and to "additional compensation for the excavation of unstable soil” (emphasis added). See 169 Ct. Cl. at 470, 479, 482, 484, 341 F. 2d at 603, 609, 610, 611.

 On October 26, 1965, a pretrial conference was held at wblcb time a number of exhibits were received in evidence, and counsel for tbe parties expressed tbeir respective positions as to tbe issues. A trial was conducted from February 7, 1966, to February 11, 1966, inclusive, at which time additional exhibits were received in evidence and a number of witnesses for both parties testified.
On October 19, 1966, defendant’s counsel wrote to the trial commissioner:
“This is in answer to your recent inquiry as to the Government’s position on the question whether the above-entitled case should be returned to the Federal Aviation Agency Board for an administrative hearing on the amount of damages.
“In United States v. Anthony Grace & Sons, Inc., decided during the October Term on June 6, 1966, the Supreme Court declined to distinguish between theories of liability and the issue of damages and stated that both should be initially considered by the administrative agency. However, before the Grace decision was announced, the issue of damages in the instant case was fully tried without objection by either party, and we think that it will be a needless duplication of effort to have the issue retried before the FAA Board. Accordingly, the Government hereby waives its right to have the issue of damages *414 returned to the FAA Board and requests you to issue findings in regular course so that the case can be disposed of directly in the Court of Claims.”
On October 21, 1966, plaintiff’s counsel wrote to the trial commissioner:
“I agree that the case should be disposed of in regular course by the Court of Claims.
“By this letter It should not be taken that I agree that the government has a ‘right’ to have the Issue of damages returned to the Federal Aviation Agency Contract Appeals Board, but in the present posture of the case it Is not necessary to resolve such IssueB.”

 At tlie trial there was testimony that a substantial amount of shale or shale mixture was used for backfill, but the weight of the credible evidence establishes that only a negligible amount was so used.

 There was no appreciable overburden in the trenches excavated by the subcontractor.